**WATERWAYS ON THE INTERCOASTAL, LTD., a/k/a/ Waterways on the Intracoastal, Ltd., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–07–00853–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 26, 2009.

William C Petit, Timothy Ray Brown, Houston, for Appellants.

Lisa Marie Nieman, Susan Desmarais Bonnen, Austin, for State.

Panel consists of Chief Justice HEDGES and Justices GUZMAN and BROWN.

## OPINION

EVA M. GUZMAN, Justice.

In this condemnation case, the property owner challenges the legal and factual sufficiency of the evidence supporting the jury's determination of value for real es-

tate located in Galveston County, Texas. Because the jury's finding of the condemned property's fair market value is within the range of evidence presented at trial, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In December 1999, appellant Waterways on the Intercoastal, Ltd. ("Waterways") purchased the property known as Placement Area 42 ("PA 42"), consisting of 242.364 acres on Bolivar Peninsula, for $645,660; the sale was finalized in January 2000. From 1954 to 1999, the U.S. Army Corps of Engineers had an easement on the property and used the area to deposit dredge materials from the Intracoastal Waterway. To accommodate this use, the property had a nineteen-foot levee system and a drainage outfall structure on it. The State filed a petition for condemnation on January 23, 2004, stating the Texas Transportation Commission had found the property was needed as a dredge material disposal site. The trial court appointed special commissioners to assess the damages, and they awarded $727,000 jointly to Waterways, Port Bolivar Marine Services, Inc., and Laguna Resources, Ltd.[1] The State deposited the funds into the trial court's registry on September 30, 2004,

which became the date of the taking. Waterways objected to the special commissioners' award and the case was tried before a jury in March 2007. When asked to find the fair market value of PA 42 as of September 30, 2004, the jury returned a figure of $1.8 million. The trial court denied Waterways's motion for new trial and rendered judgment on the verdict.

At trial, the jury heard from Waterways's expert appraiser Gerald Teel. Teel testified that he used three approaches to value the property: a comparable-sales approach, a replacement-cost approach, and an income approach.[2] Finding no comparable sale of a placement area, he ultimately used the comparable-sales approach only to value the land, and used the replacement-cost and income approaches to value the property as a whole. In his final analysis, Teel gave weighted consideration to the replacement-cost approach. To use this method, Teel first valued the vacant land at $3.2 million based on comparable sales. He then considered the replacement cost of the levee and outfall system by subtracting the cost to level the levee— $171,450—and adding the cost to construct a six-foot levee with an outfall structure— $652,650.[3] He ultimately valued the property at $3.9 million.[4] When considering

---

1. According to the State's petition for condemnation, John Dafonte, one of the owners of PA 42, was the registered agent for Waterways on the Intercoastal, Ltd., a/k/a Waterways on the Intracoastal, Ltd. and Port Bolivar Marine Services, Inc. Laguna Resources, Ltd. is listed in the petition as a Texas limited partnership with a different agent for service of process. Waterways, Port Bolivar Marine Services, and Laguna Resources were collectively referred to as "defendant" in the petition for condemnation. The objection to the special commissioners' award was styled "Defendant, Waterways on the Intercoastal, Ltd. a/k/a Waterways on the Intracoastal, Ltd., Objections to Special Commissioners' Award."

2. Teel assumed a taking date of August 18, 2004 in making his valuation.

3. Teel considered the cost to build a six-foot levee instead of a nineteen-foot levee in his replacement-cost valuation because, according to Teel's report, "[t]he 19' high levee is considered to have some functional obsolescence and the only remaining usable [sic] would be the 6' high levee." Hollie Stanley, the engineer who provided Teel with estimates for leveling the levee and rebuilding the levee and outfall structure, testified that he had seen a document that listed the cost for a complete reconstruction of the levee at its full height at $2.8 million to $2.9 million.

4. The jury also heard testimony on Teel's income method of valuation. Under this approach, Teel calculated the cubic yards of capacity available for dredge placement and

the highest and best use of the property, Teel explained that the property was worth $3.2 million as vacant land, which could then be developed with residential waterfront lots.[5] Under his alternate scenario, PA 42 could be used first as a dredge material disposal site to raise the elevation and later as a single-family residential tract, increasing the value of the property.

Four sales formed the basis of Teel's vacant-land valuation of PA 42:

- **Land Sale No. 1** consists of 71.93 acres of land at an elevation of about five feet. It has frontage along State Highway 87, which is the major roadway along Bolivar Peninsula, and is bounded by streets on two other sides. Although it has no water frontage, it is located one or two blocks from a public beach on the Gulf of Mexico and sold on August 7, 2004 for a total sales price of $863,160 [6] or $12,000 per acre.

- **Land Sale No. 2** consists of 63.242 acres of land that sold on August 6, 2004 for $150,000, but part of this property is wetland. Teel considered 12 acres to be usable based on conversations with one of the purchasers and the Galveston County Appraisal District. As a result, he calculated the value of the land by subtracting the value of the wetlands from the purchase price and dividing the difference by the number of usable acres, arriving at a value of $10,651 per usable acre. About 860 linear feet of this property runs along the waterfront on the Intracoastal Waterway, and its elevation is approximately five feet.

- **Land Sale No. 3** is less than ten percent of PA 42's size, and consists of 21.28 acres of land in a "horseshoe-shaped tract" on the Gulf of Mexico. The property has some frontage on State Highway 87, a total of about 200 linear feet of frontage along the beach, and its elevation is approximately ten feet. Based on its sale on January 16, 2004, Teel calculated its price to be approximately $31,250 per acre.

- **Land Sale No. 4**, sometimes referred to as "Birdhaven," is adjacent to Land Sale No. 2 and also contains wetland. It consists of 86 acres of land along the Intracoastal Waterway and sold for $250,000 on October 29, 2003. Teel considered 14 or 15 acres to be usable. He calculated the value of the land by subtracting the value of the wetlands and dividing the remainder of the purchase price by the number of usable acres to arrive at $14,687 per acre. The property has an elevation of about five feet. Approximately 880 linear feet of the property is waterfront, and the opposite end runs along State Highway 87.

Teel made adjustments to the prices per square foot for elapsed time, market condition, and condition of sale, arriving at adjusted prices of $12,000, $10,664.13, $31,802.23, and $15,041.90 for the respective properties. He testified extensively about the characteristics of each property when compared to PA 42. Of these properties, Teel found Land Sale Nos. 1, 2, and 4 to be inferior to PA 42, and Land Sale No. 3 to be superior. He considered Land Sale No. 4 to be the most similar in physical characteristics and location to PA 42.

---

the market price to deposit dredge material there. Although he ultimately valued the property using this method at $4.08 million, he considered the cost approach the better valuation method.

**5.** On appeal, Waterways states that the entire site was usable for development purposes without the costs of mitigating wetlands.

**6.** The sale did not close for nearly a year.

Based on Teel's analysis of the four sales, he valued PA 42 at $15,000 per acre. He arrived at his vacant-land valuation by taking the total acreage of PA 42 and subtracting the area he considered to contain platted roadways, arriving at a net usable acreage of 224.458 acres.[7] He then multiplied 224.458 acres by $15,000 per acre to arrive at a total of $3,366,870. Next, he subtracted $171,450, representing the cost to level the levee, and rounded the resulting figure up to $3.2 million.

In his testimony, Teel emphasized that PA 42 has approximately 7100 feet of waterfront and an elevation of approximately thirteen feet. On cross-examination, however, he agreed that "being on the Gulf of Mexico is far superior to having a whole lot of linear frontage on the Gulf Intracoastal Waterway." He further agreed that smaller tracts have a higher price per acre, and PA 42 is at least three times larger than any of the land sales he identified as comparable.

The State also cross-examined Teel about his mathematical calculations for two of the comparable sales based on usable acres. Although Teel considered all acres usable on Land Sale Nos. 1 and 3, he did not make the same determination for Land Sale Nos. 2 and 4 because the latter properties contain wetlands. Nevertheless, the State's attorney asked Teel to calculate the price per acre of Land Sale Nos. 2 and 4 using total acreage, rather than usable acres. Using a calculator, Teel divided the sales price of each property—$150,000 and $250,000—by the gross acreage of each sale—63.242 and 86—and arrived at values per acre of $2,371 and $2,907, respectively. Finally, the State asked Teel to multiply the net usable acreage of PA 42 by $2,907, resulting in a figure of $652,000. Teel, however, emphasized that this figure represented only the calculations of the State's trial counsel and not his own valuation.

According to Teel, his cost-replacement and income valuations were based on information he received from Hollie Stanley, a professional engineer. Stanley testified that he estimated the cost of leveling the six-foot high levee at $171,450 and the cost of constructing a six-foot levee at $652,650. In his report, Stanley estimated the cost to build the outfall structure to support the six-foot high levee at $50,000.[8] Stanley also stated that he had seen a document estimating the cost to completely reconstruct the levee as originally built for $2.8 million to $2.9 million. When asked whether there was a need for PA 42 as a dredge site, Stanley stated he had seen documents indicating there were several private businesses within about a five-mile radius of PA 42 with dredging needs; on cross-examination, he named a few of them. Stanley stated he was unaware of any prohibition to the operation of PA 42 as a dredge site in September 2004. Stanley also testified to the "tipping fee" he provided for use in Teel's income approach.[9]

---

7. At one point during cross-examination he appeared to suggest that the size of PA 42 was 219 acres. During his testimony, State's witness David Dominy stated that approximately 23 acres of PA 42 contain platted roadways.

8. During his testimony, Stanley stated that the cost of an outfall structure such as the one on PA 42 would be $125,000. He testified that a six-foot levee would not require an outfall structure as valuable as that found on PA 42. If he were to completely replace the levee on PA 42, he would estimate $125,000 for the outfall structure. Stanley testified that he had seen a document valuing the outfall structure on PA 42 at $200,000.

9. In his income approach, Teel calculated the amount of cubic yards available for dredge placement on PA 42 and multiplied it by the industry fee, known as the "tipping fee," charged to place dredge material on a site.

Waterways called Raul Cantu, a representative for the Texas Department of Transportation, as an adverse witness. According to Cantu, PA 42 is a unique site because the Army Corps of Engineers already possessed the environmental clearance necessary to use the property as a disposal area for dredge material and had built the outfall structure and nineteen-foot levee. Cantu agreed that there were no other properties on the Bolivar Peninsula with these characteristics.

John Dafonte, one of the owners of PA 42, testified that Waterways purchased the property in 1999 and finalized the sale in January 2000. According to Dafonte, Waterways was interested in the property because of its elevation, size, and waterfront. Dafonte testified that Waterways planned to use the property by first selling sand dredge, then operating a dredge placement facility, and finally converting it into a residential subdivision. He identified several businesses and properties in the area, including some of his own, with dredging needs. According to Dafonte, none of these plans came to fruition because the State announced its intent to take the property about a week after Waterways purchased it. Dafonte ultimately valued the property at around $5 million based on the development on Bolivar Peninsula and PA 42's characteristics.

Luis Saenz, a project engineer from the Galveston District Corps of Engineers, testified that leveling the levee on PA 42 as Teel proposed would level only the areas immediately adjacent to the levee, but would not level the entire property as required for residential development.[10]

Saenz estimated that leveling the entire property would cost from just over $800,000 to just over $1 million.

Appraiser David Dominy also testified concerning the property's value. The State questioned Dominy about the land sales on which Teel's vacant-land valuation was based. When asked to confirm that Land Sale No. 4 had a total of 86 acres of which 16.53 were usable, Dominy stated that he did not recall that 16 acres were usable, but he did recall that 86 gross acres sold for $250,000, representing a gross basis of $2,907 per acre. Regarding Land Sale No. 2, Dominy confirmed that the 63.24–acre lot sold for $150,000. The State asked Dominy whether $150,000 divided by 63.24 acres was $2,372 per acre, to which Dominy responded, "Yes, I believe that's how the math works." As to Land Sale No. 3, Dominy confirmed a purchase price of $800,000 for 21.28 acres, but stated that the price included the improvements as well as the land.[11] Dominy also confirmed that the sales price for Land Sale No. 1 was $863,160 for 71.93 acres, but he testified that he did not use this property in his valuation of PA 42. He further testified that he has never made an adjustment for the uniqueness of a property because, in his opinion, that is already accounted for when considering a property's characteristics.

Dominy also discussed a property known as Laguna Harbor.[12] He confirmed that this 77.1–acre property sold for $300,000 and that dividing the purchase price by the number of acres results in a price of $3,891 per acre. Dominy testified that, if valuing

---

**10.** As described in Teel's report, PA 42 contained "three areas where construction materials have been dug plus a man-made lake area...."

**11.** According to Teel's report, these improvements included a barn of 5,000 square feet, a

paved private road, and a wooden rail fence. Teel allocated $135,000 of the purchase price to these improvements.

**12.** The property is also referred to as Laguna Resources in the record.

PA 42, he would use this transaction in his calculation because he considered the sale an arm's-length transaction, and the property is the most similar to PA 42. The record indicates that Dominy did, in fact, use Laguna Harbor in his calculation of PA 42's value.[13] Teel, on the other hand, did not consider the sale of Laguna Harbor to be an arm's-length transaction, and as a result, he excluded the property from consideration as a comparable sale. Nevertheless, he was able to answer some questions about the property because he had served as the appraiser during its sale. Teel estimated that Laguna Harbor's waterfront is approximately one thousand feet long, and agreed that he appraised it as a residential subdivision. He also agreed that this is the highest and best use for both Laguna Harbor and PA 42. Both properties line the Intracoastal Waterway and are separated only by a marina, and access to the properties is approximately equal. Teel further testified that the amount of "waterfront feet per acre on that tract is probably closer than anything else that we've looked at."

Dominy explained that the highest and best use of a property guides him as to the value approach and comparable sales he uses. In Dominy's opinion, the cost approach was not appropriate for valuing PA 42 because the highest and best use of this property was for primary residential development; thus, the levee and outfall structure do not add value. He noted that it would take "quite a bit of money" to prepare PA 42 for development. As a result of his conclusion that the highest and best use of PA 42 was residential, Dominy determined the comparable-sales approach was the appropriate valuation method, making adjustments for all the differences between the subject property and the comparable sales.

Waterways's trial counsel cross-examined Dominy regarding one of his appraisal reports on the property. In the report, Dominy indicated that most any use of the property was legally permissible; commercial or residential use was physically possible; and a commercial endeavor would be financially feasible. Dominy concluded that the maximally productive use of the property would be a waterfront development that included residential use as a component. He reiterated that the levee on PA 42 did not add value to the highest and best use of the property and that it is "actually something that's going to have to be knocked down in order to level this property out for ultimate development." When asked whether he considered elevation in his valuation approach, Dominy testified that he felt the benefit of having a higher elevation was offset by the costs to ready the property for development. Although Dominy testified that he had not determined the cost to ready PA 42 for development, he noted that another property incurred costs of $35,000 per acre to plant grass and trees. On cross-examination, Waterways elicited testimony that in one of his reports, Dominy valued PA 42 at $2,908,368, but only the page on which Dominy discussed the property's highest and best use was admitted into evidence. Teel's report, on the other hand, was admitted in its entirety. In addition to Teel's valuation analysis, it contains a variety of maps—aerial, topographical, flood plain, land sales, neighborhood, and plat maps—surveys, a metes and bounds description, detailed information about the comparable sales, and the history, site

---

**13.** During direct examination, Dominy stated, "[I]tem B is the first transaction that I utilized which is as you can see just across this little area from the subject property or disposal area 42 or Placement Area 42." He later confirmed that "B" was Laguna Harbor.

analysis, and tax analysis [14] of the property.

## II. ISSUES PRESENTED

In two issues, Waterways challenges the legal and factual sufficiency of the evidence supporting the jury's finding that the fair market value of the property on the date of the taking was $1.8 million.

## III. STANDARD OF REVIEW

■■■ To determine whether the evidence is legally sufficient to support the judgment, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We assume that jurors decided questions of credibility or conflicting evidence in favor of the verdict if they reasonably could do so. *Id.* at 819, 820. If the evidence would enable reasonable and fair-minded people to differ in their conclusions, then it is legally sufficient to support the verdict. *Id.* at 822. We do not substitute our judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement. *Id.* When reviewing a jury finding for factual sufficiency, we consider and weigh all of the evidence in a neutral light and conclude that the finding is not supported by sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

## IV. ANALYSIS

■■ Fair market value is the price that the property would bring in a transaction between a willing buyer and a willing seller. *City of Austin v. Cannizzo,* 153 Tex. 324, 331, 267 S.W.2d 808, 813 (1954). Thus, the jury was instructed as follows:

> The term "fair market value" means the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future.

Waterways contends that the value opinions—Dafonte's $5 million valuation, Teel's $3.9 million valuation, and Dominy's testimony that he reported a value of $2,908,368—created the range for the jury's consideration, and argues that no witness testified to a fair market value below $2.9 million. Because the jury's finding fell outside this range, Waterways contends the evidence is legally and factually insufficient to support the verdict.

### A. *Callejo v. Brazos Electric Power Cooperative, Inc.*

In support of its contention, Waterways relies on the Texas Supreme Court case of *Callejo v. Brazos Electric Power Cooperative, Inc.* 755 S.W.2d 73 (Tex.1988). In *Callejo,* the court upheld a legal-sufficiency challenge to the evidence supporting the jury's finding that the post-taking value of an easement condemnation was $364,928.80. *Id.* at 74. The condemnor's experts testified that the property had a pre-taking value of $67,082 and a post-taking value of $33,541; the landowner and his two experts testified that the property's pre-taking value was in the range of

---

14. In the tax analysis, it is stated that "[t]his is a 374.8–acre tract with a 2004 market assessed value of $635,840 or $1,696 per acre and an agricultural productivity value of $14,990 or $40 per acre." This information includes the parent tract.

$643,987.20 to $729,256, and its post-taking value was zero. *Id.* As the court explained, "There is simply no testimony *or other evidence* in this record that the post-taking value was higher than $33,541...." *Id.* at 75 (emphasis added).

The *Callejo* court rejected the notion that the jury may calculate post-taking value by "blending" testimony concerning pre-taking value with testimony regarding post-taking value. *Id.* The court explained that, although jurors are not bound, as a matter of law, to accept expert testimony, they cannot "leap entirely outside of the evidence in answering any question submitted to them." *Id.* The court also found unpersuasive the argument that jurors are entitled to rely on their own knowledge and experience as a substitute for evidence on post-taking value. *Id.; see also State v. Huffstutler,* 871 S.W.2d 955, 959 (Tex.App.-Austin 1994, no writ) (affirming judgment notwithstanding the verdict because the only evidence of value was the testimony of one expert that the property's value was $310,000 and the owner's testimony that the property's value was $450,000, but the jury assigned the property a value of $230,000).

## B. *Parallax Corporation v. City of El Paso*

The State responds that jurors are not bound by the expert testimony, but instead have the discretion to award damages within the range of the evidence presented at trial. In support of this argument, the State cites *Parallax Corporation, N.V. v. City of El Paso,* a statutory condemnation case, for the proposition that "the expert's testimony as to damages is merely the beginning point rather than the ending point in examining the sufficiency of the evidence...." 910 S.W.2d 86, 92 (Tex. App.-El Paso 1995, writ denied). In *Parallax,* the Eighth Court of Appeals held that Parallax waived its legal-sufficiency challenge, but stated that, even if the challenge had been preserved, there was evidence supporting the jury's finding that the condemned land had a fair market value of $606,703.76. *Id.* at 90–91. In particular, the City's expert testified to a value of 20 cents per square foot, arriving at a total figure close to the jury's finding-$672,000. *Id.* In addition, the jury considered evidence supporting a lower price per square foot, and evidence that appraisals are not an exact science. *Id.* at 91. The court further held that the evidence was factually sufficient because the jury did not significantly depart from the value range presented by the experts at trial. *Id.* at 92–93. The court distinguished *Callejo* and *Huffstutler,* stating that both courts relied upon the absence of value evidence other than expert testimony in the respective records. *Id.* at 91–92. In contrast, the *Parallax* court cited detailed information about various comparable sales and testimony that appraisals are inexact. *Id.* at 91–93. Finally, the court stated that such evidence created a "range" from which the jury could calculate value. *Id.* at 92–93.

█ Waterways, on the other hand, asserts that *Parallax* was wrongly decided and should not be followed by this court.[15]

**15.** This court has cited *Parallax* with approval before, *see Bayer Corp. v. DX Terminals, Ltd.,* 214 S.W.3d 586, 606 (Tex.App.-Houston [14th Dist.] 2006, pet. denied), as have the First, Second, Third, Sixth, and Thirteenth Courts of Appeals. *See, e.g., Pleasant v. Bradford,* 260 S.W.3d 546, 560 (Tex.App.-Austin 2008, pet. denied); *Kinder Morgan N. Tex. Pipeline, L.P.*

*v. Justiss,* 202 S.W.3d 427, 443 (Tex.App.-Texarkana 2006, no pet.); *Exxon Pipeline Co. v. Zwahr,* 35 S.W.3d 705, 716 (Tex.App.-Houston [1st Dist.] 2000), *rev'd on other grounds,* 88 S.W.3d 623 (Tex.2002); *Aboud v. Schlichtemeier,* 6 S.W.3d 742, 748 (Tex.App.-Corpus Christi 1999, pet. denied); *Chitwood v. State,* No. 2-04-323-CV, 2006 WL 1452621,

According to Waterways, the jury's value finding must correspond with expert opinion testimony regarding the property's fair market value. Significantly, however, Waterways bases this argument on cases in which no other value evidence was identified in the record. *See, e.g., Callejo,* 755 S.W.2d at 75 ("There is simply no testimony *or other evidence* in this record that the post-taking value was higher than $33,541 . . . .") (emphasis added); *Huffstutler,* 871 S.W.2d at 959 ("Evidence admitted at trial about the value of the property was based on the testimony of two witnesses . . . ."); *Wegner v. State,* 829 S.W.2d 922, 923 (Tex. App.-Tyler 1992, writ denied) ("The Wegners' two value witnesses provided the only evidence on the issue."). As long as "a rational basis for the calculation of damages exists, a jury's finding will not be disregarded merely because its reasoning in arriving at its figure may be unclear." *Pleasant v. Bradford,* 260 S.W.3d 546, 559 (Tex.App.-Austin 2008, pet. denied).

## C. Value Evidence

█ Here, the jury was presented with documentary evidence as well as expert testimony from which it could evaluate the property's fair market value. The record includes extensive testimonial and documentary evidence regarding the comparability of five other sales, as well as conflicting testimony regarding the highest and best use of the property, the number of usable acres, the cost to level the levee, and fair market value overall. Teel testified that the most profitable use of the property would be to operate it as a dredge material placement site until it reached capacity, then develop residential property. Dominy, however, testified that PA 42, like Laguna Harbor, would be best developed for primary residential use, and that rather than adding value to the property, the levee and outfall improvements would have to be removed or redesigned. The jury was free to find Dominy's testimony more persuasive, and thus, accord less weight to Waterways's evidence of the cost of these improvements and of possible income from tipping fees or sales of dredge materials.

In arguing that the jury computed a value outside the range of evidence, Waterways cites testimony on three points: Dafonte's testimony that the property's value on September 30, 2004 was $5,000,000; Teel's testimony that the property was worth $3,900,000; and Dominy's testimony that he wrote a report in which he estimated PA 42's fair market value at $2,908,368. This picture, however, is incomplete. Not only was each witness subjected to searching cross-examination to highlight weaknesses in his respective position, but the jury also considered Teel's detailed report, maps, photographs, surveys, and descriptions of comparable sales.

█ Waterways theorizes that the jury's market-value finding is based on calculations that applied the gross price per acre for a combination of usable and unusable acreage on comparable sales properties to the number of usable acres on PA 42. The State, on the other hand, contends that the jury's finding is supported by the evidence of the property's purchase price at a bankruptcy sale four years earlier [16] and its assessed tax value.[17]

at *3 (Tex.App.-Fort Worth May 25, 2006, pet. denied) (mem.op.).

16. Actual sale price is not prima facie evidence of market value when the sale is not one between a willing buyer and a willing seller. *See SPT Fed. Credit Union v. Big H Auto Auction, Inc.,* 761 S.W.2d 800, 801 (Tex. App.-Houston [1st Dist.] 1988, no writ) (holding trial court did not err when it concluded evidence that boat sold at auction for $700 after being reclaimed by credit union was not sufficient to show boat's fair market value).

On this record, however, the jury's finding falls within the range of the evidence without relying on such methods or background information. And "[w]hen the trial evidence supports a range of damages awards, 'as opposed to two distinct options,' an award within that range is an appropriate exercise of the jury's discretion...." *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex.App.-San Antonio 2006, no pet.) (quoting *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 150 S.W.3d 718, 740 (Tex.App.-Austin 2004), *rev'd on other grounds*, 235 S.W.3d 695 (Tex.2007)). Here, as the following example illustrates, the jury's valuation finding may be based on a variety of factors and conflicting evidence.

Teel testified that he arrived at his valuation for the land alone by considering four comparable sales to arrive at price for each usable acre, multiplying the price per acre by the number of usable acres, subtracting the cost to level the levee for development, and rounding up. Thus, he began with a price of $15,000 per acre; multiplied this by 224.458 usable acres to obtain a gross sales price of $3,366,870; subtracted $171,450 as the cost to level the levee; and rounded the result upwards to arrive at a total of $3,200,000. But the State offered evidence that there were only 219.337 usable acres and the cost to level the property could be as high as $1,000,000. Using these figures, the jury could have valued each usable acre of PA 42 as high as $12,765.74 and still concluded that the fair market value of the property was only $1,800,000.[18] This price-per-acre is more than three times higher than the $3,891.00 per acre paid for Laguna Harbor. It also exceeds the price paid for each usable acre of Land Sale Nos. 1 and 2, based on their sales prices as determined in August 2004, only a month before the taking. *See Exxon Pipeline Co. v. Zwahr*, 35 S.W.3d 705, 716 (Tex.App.-Houston [1st Dist.] 2000) (explaining that the jury could compute fair market value from detailed information regarding comparable sales), *rev'd on other grounds*, 88 S.W.3d 623 (Tex.2002). It was within the jury's discretion to accord less weight to Land Sale No. 3, which occurred eight months before the taking and, unlike PA 42, involved beachfront property on the Gulf of Mexico with direct access to State Highway 87. Similarly, the jurors could find Land Sale No. 4, which occurred nearly a year before the taking, a less "comparable" sale than those that took place closer in time to the State's taking of PA 42.

We cannot and need not know how the jury arrived at its finding, but as the foregoing discussion demonstrates, the finding is supported by more than a scintilla of evidence; thus, the evidence is legally sufficient to support the judgment. Because we cannot say, based on this record, that the jury's finding is against the great weight and preponderance of the evidence, we conclude that the evidence is factually sufficient as well.

## V. CONCLUSION

Because the jury's finding falls within the range of the evidence, we conclude that

17. *But see City of Sherman v. Wayne*, 266 S.W.3d 34, 49 (Tex.App.-Dallas 2008, no pet.) ("[T]he tax appraisal is no criterion of market value in condemnation proceedings because it rarely reflects the true market value."); *Houston Lighting & Power Co. v. Fisher*, 559 S.W.2d 682, 686–87 (Tex.Civ.App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.) ("[I]t is generally held that the value placed upon real property for the purposes of taxation by assessment without participation of the landowner is not evidence of its value for purposes other than taxation.").

18. (219.337 acres × $12,765.74/acre)-$1,000,000.00 leveling cost = $1,799,999.11.

the evidence is legally and factually sufficient to support the finding. We therefore overrule Waterways's first and second issues on appeal and affirm the trial court's judgment.