**Opinion issued December 22, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-14-00872-CV

_____

**CALHOUN/HOLIDAY PLACE, INC., ARTISAN/AMERICAN CORP., VERNON YOUNG AND ELIZABETH YOUNG, Appellants**

**V.**

**WELLS FARGO BANK, N.A., SUCCESSOR-BY-MERGER TO WACHOVIA BANK, NATIONAL ASSOCIATION, Appellee**

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-56876**

---

# MEMORANDUM OPINION ON REHEARING[1]

---

[1] Appellants have filed a motion for rehearing and a motion for en banc reconsideration of our June 14, 2016 opinion and judgment. We grant the motion for rehearing, withdraw our opinion and judgment of June 14, 2016, and issue this opinion and a new judgment in their stead. Accordingly, we dismiss the motion for

Calhoun/Holiday Place, Inc., Artisan/American Corp., Vernon Young, and Elizabeth Young (appellants) appeal from a final judgment, rendered upon trial to the jury and to the bench, in favor of appellee, Wells Fargo Bank, N.A., successor-by-merger to Wachovia Bank, National Association (Wells Fargo). In three issues, appellants argue that (1) the trial court erred by admitting evidence of Wells Fargo's sale of the property for $675,000 in May 2013; (2) there is legally and factually insufficient evidence to support the jury's finding that the property had a fair market value of $800,000 on the foreclosure date; and (3) the trial court erred by awarding attorney's fees to Wells Fargo. We affirm.

## Background

Vernon Young and his wife Elizabeth formed Calhoun/Holiday Place, Inc. (Calhoun) for the purpose of developing a gated, 120-unit residential subdivision in Houston known as Holiday Place. Calhoun purchased an undeveloped 6.371 acre tract of land located in central Houston for $950,000 (the Property) and borrowed $1,590,000 from Wells Fargo's predecessor in interest to develop the project for detached townhomes in 2006 (the Note). The Note was secured by a deed of trust on the Property and guaranteed by Artisan/American Corp. and the Youngs.

en banc reconsideration as moot. *See, e.g.*, *Brookshire Bros. v. Smith*, 176 S.W.3d 30, 41 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

2

The infrastructure was in place and the Property's lots were ready for home construction by the fall of 2008. Unfortunately, environmental contamination on an adjacent industrial property owned by CES Environmental Services thwarted construction plans on the Property for several years. Local, state, and federal actions ultimately led to the closing of CES and its bankruptcy in 2010. Appellants filed a lawsuit against CES in 2009 to recover damages caused by this delay in the development of the project. Vernon Young testified that he would have been able to begin marketing and constructing townhomes on the Property in mid to late 2011, except for the fact that Wells Fargo decided to proceed with the foreclosure in September 2011.

On September 22, 2011, Wells Fargo sued Calhoun for breach of the Note and Artisan/American and the Youngs for breach of their guaranty agreements. Wells Fargo foreclosed on November 1, 2011, and purchased the Property with a credit bid of $532,570 at the foreclosure sale, leaving a deficiency of $1,415,652. Wells Fargo later amended its petition and sought to recover on this deficiency amount. Wells Fargo eventually sold the Property to a neighboring charter school for $675,000 in May 2013, approximately eighteen months after the foreclosure sale.

Appellants answered and filed three counterclaims seeking a declaratory judgment with respect to Wells Fargo's interest in the proceeds of appellants' lawsuit against CES and a valuation of the Property pursuant to the Texas Property Code,

3

and asserting a claim for wrongful foreclosure with respect to any recovery in the CES lawsuit. The appellants' declaratory judgment and wrongful foreclosure claims were resolved in September 2012,[2] and the only issue remaining to be tried was the fair market value of the Property on the date of the foreclosure sale.

Before trial, the parties stipulated that:

(1) the Note matured on January 23, 2009, and appellants failed to pay the outstanding amounts due and owing under the Note;

(2) Wells Fargo foreclosed on the Property and sold it at auction on November 1, 2011;

(3) Wells Fargo purchased the Property at the foreclosure sale for a credit bid of $542,570; and

(4) appellants owed Wells Fargo $1,948,187.72 on November 1, 2011, including all applicable interest and fees.

Three witnesses testified about the Property's fair market value on November 1, 2011: Wells Fargo's appraiser, Phillip Barletta; appellants' appraiser, William Forrest; and Vernon Young.

Vernon Young testified that the Property had a fair market value of $2,400,000 on November 1, 2011. Young based his valuation on his experience as a homebuilder, and specifically, what he thought the townhomes could sell for in the future, if they were built at all, and "what it would have cost" to develop the lots in November 2011. Appellants' appraiser, Forrest, prepared a 2012 report in which he

---

[2] The CES lawsuit was settled, and the net proceeds of the suit, $629,786.44, were deposited in the registry of the court subject to Wells Fargo's security interest.

assessed the Property's fair market value to be $1.71 million as of the foreclosure date, based on his analyses of comparable sales of homes and residential lots. Wells Fargo's appraiser, Barletta, prepared three reports in which he assessed the Property's fair market value to be $550,000 as of August 20, 2010, $590,000 as of August 26, 2011, and $650,000 as of May 2013. Barletta also prepared an October 2013 report critiquing Forrest's 2012 appraisal. Based on his 2011 and 2013 appraisals, Barletta opined at trial that the fair market value of the Property on November 1, 2011 was between $590,000 and $650,000.

Forrest's and Barletta's appraisals of the Property share several similarities. Although Forrest and Barletta differed in their choice of comparable sales and their adjustments to those sales, their valuations of the individual lots was relatively close—Barletta valued the lots at $14,500 each and Forrest valued them at $20,800 each. Both experts also recognized that because lots in a subdivision sell over an extended period of time, they had to project the time it would take to sell all of the lots, i.e., the absorption rate, and then discount those future sales to a present value, as of November 1, 2011. The primary difference between the two appraisals is that Barletta projected that it would take several years longer to sell all of the lots than Forrest. In addition to using a longer absorption rate, Barletta also used a higher discount rate because he perceived the Property's future development to be riskier than Forrest.

5

In his October 2013 report, Barletta criticized Forrest's appraisal on a number of grounds. Specifically, Barletta took issue with Forrest's comparison of the Property's small townhome lots with the sale of single-family homes in residential subdivisions. According to Barletta, not only did the single-family homes used by Forrest have lot sizes that were two to three-and-one-half times larger than the Property's lots, but the pool of buyers for single–family residences is traditionally much greater than the pool of buyers for townhomes. Barletta also noted that although Forrest "concede[d] that the [Property] is 'stigmatized'" in his report and acknowledged that it usually takes ten years before stigmatized properties reclaim their previous values, Forrest "never consider[d] such 'stigma' in [his] actual analyses" or made any adjustments to his aggressive absorption projections based on stigma.

On cross-examination, Forrest testified that he based his appraisal of $1.7 million on his assumption that, as of November 1, 2011, the Property was clear of any environmental contamination and was no longer stigmatized by CES's environmental problems. He further testified that although it takes approximately ten years before a property regains its pre-stigma value, the "stigmatism is usually over [after] three to four years and then [the] value starts continuing to rise." Forrest also acknowledged that although it is important to use sales data comparable to the subject property when performing an appraisal, none of the sales he used to calculate

the Property's value were for similarly sized townhome lots. Forrest testified that his appraisal "did not take into consideration that [the Property] is adjacent to a property that was previously contaminated." He also testified that he did not know if any of the residential subdivisions he included in his analysis were adjacent to an industrial property or a recently contaminated property.

Barletta's 2010 and 2011 appraisals, Forrest's 2012 appraisal, and Barletta's report criticizing Forrest's appraisal were all admitted into evidence without objection. Although appellants objected to Barletta's 2013 appraisal based on the report's discussion of the May 2013 sale, the trial court overruled the objection.

At the conclusion of the testimony, the jury was asked to answer one question: "What was the Fair Market Value of the Property as of November 1, 2011?" "Market Value" was given its usual definition, without reference to the types of competent evidence described in the Texas Property Code. The trial court instructed the jury as follows:

> You are instructed that 'Fair Market Value' is the price the property will bring when offered for sale by one who desires to sell, but is not obligated to sell, and is bought by one who desires to buy, but is under no necessity of buying.

November 1, 2011 is the date Wells Fargo foreclosed on the Property. The jury answered: $800,000.

The issue of attorney's fees was subsequently tried to the bench. After the bench trial, the trial court signed a final judgment awarding Wells Fargo

$1,148,187.72, which is the amount of debt stipulated to by the parties, minus the $800,000 fair market value of Property as found by the jury, plus $249,809.73 in prejudgment interest and post-judgment interest. The trial court also awarded Wells Fargo $180,163.50 in attorney's fees, $32,493.44 in expenses, and an additional $40,000 in conditional appellate attorney's fees.

This appeal followed.

## Property Code Section 51.003

Property Code section 51.003 provides in part as follows:

(b) Any person against whom such a recovery is sought by motion may request that the court in which the action is pending determine the fair market value of the real property as of the date of the foreclosure sale. The fair market value shall be determined by the finder of fact after the introduction by the parties of competent evidence of the value. Competent evidence of value may include, but is not limited to, the following: (1) expert opinion testimony; (2) comparable sales; (3) anticipated marketing time and holding costs; (4) cost of sale; and (5) the necessity and amount of any discount to be applied to the future sales price or the cashflow generated by the property to arrive at a current fair market value.

TEX. PROP. CODE ANN. § 51.003(b) (West 2014).

## Admission of Evidence

In their first issue, appellants argue that the trial court erred by admitting references to the sales price of Wells Fargo's post-foreclosure sale in Barletta's trial testimony and his July 19, 2013 appraisal report. Appellants argue that the evidence should not have been admitted because the sale was not made under ordinary market

8

conditions. Specifically, appellants contend that the Property was not marketed for its highest and best use as a developed subdivision, and instead, was sold to a non-profit school for expansion of its facilities.

Appellants filed a motion in limine seeking to exclude all evidence of the post-foreclosure sale, arguing that the evidence was inadmissible because there was no evidence showing the circumstances of the sale or how the Property was marketed, and there was no evidence regarding the comparability of market conditions. *See Village Place, Ltd. v. VP Shopping, LLC*, 404 S.W.3d 115, 134 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (holding subsequent sale of property ordinarily is not evidence of value on earlier date, absent evidence that later sale was made under similar market conditions). The trial court explained that it was denying the motion in limine because Wells Fargo's post-foreclosure sales price was the type of evidence that appraisal experts relied upon when forming an opinion on the fair market value of a given property. Appellants made the same objection to the admission of Barletta's May 2013 appraisal that referred to the post-foreclosure sale. The trial court overruled the objection and admitted the appraisal.

If the price at which real property is sold at a foreclosure sale is less than the unpaid balance of the indebtedness secured by the property, resulting in a deficiency, an action may be brought to recover the deficiency. *See* TEX. PROP. CODE ANN. § 51.003(a) (West 2014). Any person sued for recovery of such a deficiency may

ask the court to determine the property's fair market value as of the foreclosure-sale date and if the property's fair market value is greater than the sale price, the person being sued is entitled to an offset. *See id.* § 51.003(b), (c) (West 2014). Section 51.003(b) states that the property's fair market value shall be determined by the factfinder after the parties introduce competent evidence of value. *Id.* § 51.003(b).

The Texas Supreme Court recently held that section 51.003(b) contemplates the use of a post-foreclosure sales price as competent evidence of fair market value. *See PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 556 (Tex. 2015). Appellants argue that the supreme court's opinion in *PlainsCapital* should not be applied retroactively to "justify [the trial court's] ruling after the fact." It is well established that a Texas Supreme Court decision "operates retroactively unless [the] Court exercises its discretion to modify that application." *Bowen v. Aetna Cas. & Sur. Co.*, 837 S.W.2d 99, 100 (Tex. 1992). Because the Court did not indicate that its holding in *PlainsCapital* was intended only to operate prospectively, we will apply it retroactively.[3]

---

[3]    Appellants also contend that we should disregard the Texas Supreme Court's opinion in *PlainsCapital* for purposes of our analysis because the exception to the common definition of "fair market value" created in that opinion was not raised in the trial court, and, instead, the jury was instructed to determine the Property's fair market value based on the commonly understood definition. Neither point, however, is relevant to the question presented by appellants' first issue—whether the trial court abused its discretion by admitting evidence of the post-foreclosure sale.

Appellants also contend that *PlainsCapital*'s exception to the common definition of "fair market value" is inapplicable here because the Property was not marketed for its highest or best use. *PlainsCapital* expressly declined to hold that "the future sales price" requires a "showing of comparable market conditions between the foreclosure sale and the future sale" because that "would be adding words to § 51.003." *PlainsCapital*, 459 S.W.3d at 556. In reaching its decision, the court held that evidence of a future sales price "will support a fair market value finding under [Property Code section 51.003] even though that type of evidence might not otherwise be competent in the common or historical fair market value construct." *Id.* at 556–57. Accordingly, evidence of a property's post-foreclosure sales price is admissible for purposes of section 51.003, regardless of the circumstances of the sale. *See id.*

In light of the Supreme Court's decision in *PlainsCapital*, we cannot say that the trial court abused its discretion when it admitted evidence of the post-foreclosure sale. *See id.* at 556; *see generally Barnhart v. Morales*, 459 S.W.3d 733, 742 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding appellate court can uphold evidentiary ruling on any legitimate basis, even if that basis was not raised in trial court).

We overrule appellants' first issue.

**Legal and Factual Sufficiency**

In their second issue, appellants argue that the evidence is legally and factually insufficient to support the jury's finding that the Property had a fair market value of $800,000 on the date of the foreclosure sale. A section 51.003 offset operates as an affirmative defense to a deficiency claim, and therefore, appellants bore the burden of proof on this issue. *See PlainsCapital*, 459 S.W.3d at 557.

**A.    Standard of Review**

A party attacking the legal sufficiency of an adverse finding on an issue on which that party bears the burden of proof must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue, and it may prevail on appeal only if no evidence supports the adverse finding and the contrary position is conclusively established. *See PlainsCapital*, 459 S.W.3d at 557; *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 815–16 (Tex. 2005) (explaining nature of conclusive evidence). We consider all of the evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. In determining whether legally sufficient evidence supports the finding under review, we consider evidence favorable to the finding, if a reasonable fact finder could consider it, and disregard evidence contrary to the finding, unless a reasonable fact finder could not disregard it. *Id.* at 827.

When a party attacks the factual sufficiency of an adverse finding on an issue on which he has the burden of proof, he "must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242. In reviewing a factual sufficiency challenge, we consider all of the evidence and set aside a verdict only if the evidence is so weak that the finding is clearly wrong and unjust. *Id.*

The jury is the sole judge of the credibility of the witnesses and the weight of their testimony. *City of Keller*, 168 S.W.3d at 819. The jury may believe one witness and disbelieve another as it resolves inconsistencies in the testimony. *Id.* at 819–20.

## B.    Analysis

Appellants argue that the only evidence supporting the jury's finding that the Property had a fair market value of $800,000 on the date of foreclosure is Wells Fargo's post-foreclosure sale of the Property, which is inadmissible, and Barletta's appraisals valuing the Property between $590,000 and $650,000, which are insufficient to support a judgment.[4]

---

[4]    Wells Fargo responds that even if this evidence is excluded, there is sufficient evidence to support the jury's finding of fair market value. We agree. Accordingly, we will not consider Barletta's appraisals of the Property, or his testimony valuing the Property between $590,000 and $650,000, as competent evidence of the Property's fair market value for purpose of our sufficiency analysis.

At trial, appellants presented evidence that the Property had a fair market value of between $1.71 million and $2.4 million on November 1, 2011.[5] Wells Fargo introduced Barletta's October 2013 report criticizing Forrest's appraisal into evidence, and presented testimony that the Property was sold in May 2013 for $675,000. The testimony and evidence before the jury was uniform in showing that some stigma had attached to the Property because of prior environmental contamination problems on the adjacent tract. There was extensive testimony explaining the different discounts to be applied to the value of the Property as a result of this stigma.

In light of our resolution of appellants' first issue, we conclude that evidence of the May 2013 sale is "competent evidence" of the Property's fair market value on November 1, 2011, the date of foreclosure. *See* TEX. PROP. CODE ANN. § 51.003(b); *PlainsCapital*, 459 S.W.3d at 556–57. Thus, the jury's finding of $800,000 was within the range of fair market values permitted by the evidence ($675,000 to $2,400,000). As the sole judge of the credibility of the witnesses and the weight of their testimony, it was within the jury's province to credit Forrest's appraisal of $1,710,000, but then reduce that value to $800,000 in light of the factors Barletta

---

[5] Although Wells Fargo argues that Vernon Young's testimony is incompetent evidence of the Property's fair market value, it is not necessary for the Court to address this issue in order to dispose of the appeal.

14

raised in his October 2013 report, or points Forrest testified to on cross-examination. *See City of Keller*, 168 S.W.3d at 819

After considering the evidence in the light most favorable to the verdict, and indulging every reasonable inference that would support it, we conclude that there is legally sufficient evidence to support the jury's finding that the Property had a fair market value of $800,000 on November 1, 2011. *See PlainsCapital*, 459 S.W.3d at 557; *see also Waterways on Intercoastal, Ltd. v. State*, 283 S.W.3d 36, 46–47 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding evidence legally and factually sufficient to support jury's fair market value finding because finding was within range of evidence presented at trial). In light of the entire record, we cannot say that the finding is against the great weight and preponderance of the evidence. *See PlainsCapital*, 459 S.W.3d at 557; *see also Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 666 (Tex. App.—Houston [14th Dist.] 2012, no pet.), *abrogated in part on other grounds by PlainsCapital*, 459 S.W.3d at 553 n.1 (stating factfinder is allowed to set fair market value at any amount between lowest and highest values supported by evidence).

We overrule appellants' second issue.

### Attorney's Fees

In their third issue, appellants argue that the trial court erred by awarding attorney's fees to Wells Fargo. Appellants contend that the attorney's fee award

should be reversed because Property Code sections 51.003(b) and 51.005(b) do not authorize an award of attorney's fees, Wells Fargo was not a "prevailing party," and Wells Fargo failed to segregate its fees between claims for which attorney's fees are recoverable and claims for which they are not. Appellants also argue in the alternative that, even if the trial court was correct in awarding Wells Fargo some amount of attorney's fees, the court, nevertheless, erred by failing to take into account the extent to which each party prevailed on the valuation issue and reducing the amount of Wells Fargo's fee award accordingly.

## A.    Standard of Review and Applicable Law

We review a trial court's decision to award attorney's fees for an abuse of discretion. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004). To recover attorney's fees under Civil Practice and Remedies Code section 38.001, a party must prevail on a cause of action for which attorney's fees are recoverable and recover damages. *See Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009); *see also Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). "Parties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's . . . ." *KB Home*, 295 S.W.3d at 653. In such cases, the language of the contract, not the statute, governs. *See id.*

Generally, the party seeking attorney's fees must segregate its fees between claims for which attorney's fees are recoverable and claims for which they are not.

*Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). Whether a party needs to segregate its fees is a question of law. *Id.* at 312–13. A party recovering attorney's fees pursuant to a contractual agreement only needs to segregate its claims to the extent required by the contract language. *See generally Fitzgerald v. Schroeder Ventures II, LLC*, 345 S.W.3d 624, 630–31 (Tex. App.—San Antonio 2011, no pet.) (holding prevailing party entitled to recover attorney's fees for tort claims because contractual provision authorizing fee recovery was broad enough to encompass tort claims).

In construing a written contract, the primary concern is to ascertain and give effect to the parties' intentions as expressed in the document. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). Contract terms will be given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). If, after applying the pertinent contract construction rules, the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312.

**B.     Analysis**

Wells Fargo pleaded for attorney's fees under Civil Practice and Remedies Code section 38.001 and the contractual attorney's fee provisions in the Note and guaranty agreement. *See* TEX. CIV. PRAC. & REM. CODE ANN. 38.001 (West 2014).

The Note's attorney's fees provision states:

> If any holder of this note retains an attorney in connection with any default or to collect, enforce or defend this note or any of the Loan Documents in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Maker sues any holder in connection with this note or any of the Loan Documents and does not prevail, then Maker agrees to pay to each such holder, in addition to principal and interest, all reasonable costs and expenses incurred by such holder in trying to collect this note or in any such proceeding, including reasonable attorney's fees.

Thus, the Note obligates appellants to pay Wells Fargo "all reasonable costs and expenses incurred . . . in any such proceeding, including reasonable attorney's fees," if (1) Wells Fargo retains an attorney to collect on or enforce the Note or any of the guarantees[6] in any lawsuit or other proceeding; *or* (2) appellants sue Wells Fargo "in connection with this note or any of the Loan Documents and does not prevail." The contract does not condition Wells Fargo's recovery of costs, expenses, and attorney's fees on Wells Fargo being a prevailing party in the lawsuit. Accordingly, the Note governs Wells Fargo's right to recovery of attorney's fees. *See KB Home*,

---

[6]     The guaranty agreement is a "Loan Document."

295 S.W.3d at 653 (indicating when contract provision sets forth looser fee-recovery standard than Chapter 38, contract language governs).[7]

This suit for breach of contract to recover the deficiency due on the Note is the type of lawsuit contemplated by the fee-recovery provision. Furthermore, the Note's fee-recovery provision entitles Wells Fargo to recover reasonable costs, expenses, and attorney's fees "incurred . . . in trying to collect this note or in any such proceeding." This language is broad enough to encompass all of appellants' counterclaims and affirmative defenses in the underlying lawsuit. Accordingly, there is no need to segregate the attorney's fees in question. We hold that the Note's unambiguous fee-recovery provision entitles Wells Fargo to recover all of its attorney's fees incurred in the underlying lawsuit.

Alternatively, appellants argue that, even if the trial court was correct in awarding Wells Fargo some amount of attorney's fees, the court, nevertheless, erred by failing to take into account the extent to which each party prevailed on the valuation issue and reducing the amount of Wells Fargo's fee award accordingly. Specifically, appellants contend that "the amount involved" and "the results obtained" are key factors to be considered in evaluating the reasonableness of an attorney's fee award. *See Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 548

---

[7] The guaranty agreement also contains a similarly broad fee and expense recovery provision that is less restrictive than Chapter 38.

(Tex. 2009). Appellants further contend that the trial court erred by ignoring the extent to which Wells Fargo did not succeed in its trial position because the court awarded Wells Fargo the full amount of its attorney's fees, despite the fact that the jury found that the fair market value of the property was greater than the value advocated by Wells Fargo.

We review the amount of attorney's fees awarded under a legal sufficiency standard, viewing the evidence in a light that tends to support the disputed finding and disregarding evidence and inferences to the contrary. *See EMC Mortg. Corp. v. Davis*, 167 S.W.3d 406, 418 (Tex. App.—Austin 2005, pet. denied). "If more than a scintilla of evidence supports the challenged finding, the legal sufficiency challenge must fail." *Id.*

Although the "the amount involved and the results obtained" are relevant in assessing the reasonableness of a trial court's determination of attorney's fees, these are just two of several factors to be considered. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). Other factors include the nature and difficulty of the case, the time and labor spent, the legal skills and experience required, the attorney's experience, reputation, and ability, and the fees customarily charged in the area for similar legal services. *See id.* A trial court need not receive evidence on each *Arthur Andersen* factor and may "look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common

knowledge of the participants as lawyers and judges, and the relative success of the parties." *Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 318 (Tex. App.—Dallas 2009, pet. denied); *see Cole Chem. & Distrib., Inc. v. Gowing*, 228 S.W.3d 684, 690 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("To determine an appropriate fee award, the trial judge is entitled to look at the entire record and to view the matter in light of the amount in controversy, the nature of the case, and his or her personal experience as a lawyer and judge.").

The record reflects that Wells Fargo bought the property at the foreclosure sale for $532,570, leaving a deficiency of $1,415,652 on the note. At trial, Wells Fargo's appraiser testified that the property was valued at between $590,000 and $650,000. Appellants' expert testified that the property's fair market value was $1.7 million, and Young testified that the property was worth $2.4 million. The jury, however, disagreed with both sides and found that the property had a fair market value of $800,000. As a result of the jury's finding, appellants' offset against the deficiency they owed to Wells Fargo on the note was greater than the offset that Wells Fargo argued appellants were entitled to under the statute, but far less than the offset appellants were seeking.

Wells Fargo's two attorney's fees experts testified to some degree regarding each *Arthur Andersen* factor. In particular, one or both of the experts testified about the time and labor spent on the case, the experience, reputation, and ability of each

of the attorneys and paralegals who were involved during the various stages of the case, and the fees customarily charged in the area for similar legal services. With regard to "the amount involved and the results obtained," one of Wells Fargo's experts testified that the company's breach of contract claim was based on an approximately $1.5 million deficiency,[8] and that if the jury had found that the property had a fair market value of $2.4 million, as Young testified, then Wells Fargo would not have prevailed on its breach of contract claim at all because it would not have had any damages.

Wells Fargo's experts also testified that this was a complex case that involved "very complex UCC issues," as well as matters relevant to commercial litigation and bankruptcy. Wells Fargo's experts testified that that there were numerous issues that impacted the fair market value of the property in this case, such as the environmental contamination event on the adjacent CES property, and the fact that the foreclosure occurred during the Great Recession of 2008.

One expert opined that Wells Fargo's fees were "reasonable and necessary" "given the complexity of the case, given the issues on not the only valuation of the property but given the issues surrounding . . . the CES litigation."

---

[8] The parties stipulated that, at the time of trial, appellants owed $1,948,187.72 on the note, which included all applicable interest and fees.

Wells Fargo's second expert also testified that the amount of Wells Fargo's attorney's fees in this case was "influenced by the decisions [and] the tactics used by" appellants, such as appellants' insistence on a jury trial, as opposed to a bench trial. He further testified that appellants "chose, on numerous occasions, tactics that caused [Wells Fargo] to have to expend additional attorney's fees to move forward. For example, although appellants eventually stipulated that Wells Fargo had a security interest in the proceeds of appellants' suit against CES, appellants initially challenged Wells Fargo's interest in the proceeds of the litigation and brought a declaratory judgment claim on that issue, which Wells Fargo was forced to defend against.

Based on the testimony of Wells Fargo's experts, the trial court could have decided that although Wells Fargo did not prevail at trial to the extent that it had hoped, $180,163.50[9] in attorney's fees was, nevertheless, "reasonable and necessary" in light of the expert's testimony regarding the complexity of the case. *See Sibley v. RMA Partners, L.P./Sixth RMA Partners, L.P.*, 138 S.W.3d 455, 458-59 (Tex. App.—Beaumont 2004, no pet.) (reasoning that trial court could have considered expert's testimony that case was complicated and time consuming and

---

[9] Although Wells Fargo initially requested $204,343.14 in attorney's fees, the company reduced its request to $180,163.50 based on a mathematical error. The trial court awarded Wells Fargo $180,163.50 in attorney's fees, $32,493.44 in expenses, plus contingent appellate attorney's fees.

23

upholding $82,748 attorney's fee where client stood to recover approximately $43,000).

Accordingly, we further hold that there is sufficient evidence supporting the amount of attorney's fees awarded to Wells Fargo.

We overrule appellants' third issue.

## Conclusion

We affirm the trial court's judgment.


Russell Lloyd
Justice


Panel consists of Justices Massengale, Huddle, and Lloyd.