**Motion for Rehearing Denied; Motion for En Banc Reconsideration Denied as Moot; Affirmed and Substitute Opinion filed March 8, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-16-00037-CV

## STATE OF TEXAS, Appellant

## V.

## GLEANNLOCH COMMERCIAL DEVELOPMENT, LP, Appellee

On Appeal from County Court at Law No. 2
Harris County, Texas
Trial Court Cause No. 1042631

## M E M O R A N D U M   O P I N I O N

We issued our opinion in this case on December 21, 2017. Thereafter, the State of Texas filed a motion for rehearing and motion for en banc reconsideration. Appellee Gleannloch Commercial Development, LP, filed a response to which the State replied. We withdraw our previous opinion, vacate our previous judgment, and issue

this substitute opinion and judgment. We deny the State's motion for rehearing and deny as moot the State's motion for en banc reconsideration.

The State brings this appeal from a judgment entered upon the jury's verdict in favor of Gleannloch for $13,190,562. The State raises threes issues: (1) sufficiency of the evidence, both legal and factual, to support the amount of the jury's award; (2) the admission of evidence; and (3) application of the project influence rule. For the reasons stated below, we affirm.

## BACKGROUND

Gleannloch owned a 25.33-acre tract on Boudreaux Road, near the city of Tomball, in Harris County, Texas. In a condemnation proceeding filed January 10, 2014, the State acquired approximately 14.42 acres[1] of Gleannloch's property for the construction of a portion of Segment F-2 of State Highway 99 ("the Grand Parkway"). The 14.42 acres acquired by the State is the only portion of its property for which Gleannloch sought compensation.

A hearing was held August 5, 2014, by the appointed special commissioners and they awarded Gleannloch $4,867,946. Gleannloch objected. The commissioners' award was deposited into the registry of the court on September 3, 2014, and Gleannloch withdrew those funds.

A jury trial was then conducted in September 2015 on the question of compensation to Gleannloch for the 14.42 acres (the "subject property"). The jury's verdict valued the subject property at $13,190,562, which equates to $21 per square foot. The trial court entered judgment in accordance with the verdict. The State timely filed a motion for new trial, which was overruled by operation of law. From the trial court's judgment, the State timely filed this appeal. The State complains:

---

[1] The exact figure is 14.4197 acres, or 628,122 square feet.

- The evidence is legally and factually insufficient to support the jury's verdict;

- The trial court erred in admitting evidence; and

- The trial court improperly applied the project-influence rule.

We address each issue in turn.

## SUFFICIENCY OF THE EVIDENCE

In its first issue, the State contends the evidence was both legally and factually insufficient to support the jury's award. The State makes a single argument in support of its assertion that there was no evidence, or not enough evidence, to support the verdict — that the jury's award is greater than the highest amount adopted by an expert witness. Accordingly, we address whether the record contains evidence from which a jury could value the subject property higher than did the expert witnesses.

### A. Standard of Review

We review the entire record to determine whether the evidence is legally sufficient to support the judgment, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). If they reasonably could do so, we assume that jurors decided questions of credibility or conflicting evidence in favor of the verdict. *Id*. at 819, 820. Evidence is legally sufficient to support the verdict if it would enable reasonable and fair-minded people to differ in their conclusions. *Id*. at 822. If the evidence falls within this zone of reasonable disagreement, we do not substitute our judgment for that of the trier of fact. *Id*. When reviewing the factual sufficiency of the evidence, we examine the entire record, considering all the evidence both in favor of and contrary to the challenged finding. *Cain*

3

*v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We will overturn a finding only when it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). The fact finder is the sole judge of the weight and credibility of the witnesses' testimony and we may not substitute our judgment for that of the jury simply because we might reach a different conclusion. *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

A jury is not bound to accept valuation expert testimony. *Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 666 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Callejo v. Brazos Elec. Power Co-op., Inc.*, 755 S.W.2d 73, 75 (Tex. 1988)). However, this does not permit the jury to "leap entirely outside of the evidence in answering" a valuation question. *Callejo*, 755 S.W.2d at 75. The jury may not substitute its own knowledge and experience for a party's evidence on value. *Id.* But the jury may "set the value at any amount between the lowest and highest values by the evidence." *Preston Reserve*, 373 S.W.3d at 666 (citing *State v. Huffstutler*, 871 S.W.2d 955, 959 (Tex. App.—Austin 1994, no writ). Only if the jury's verdict lies outside the range of testimony will we find there is no evidence to support the verdict. *Callejo*, 755 S.W.2d at 75.

## B. The Evidence

The record shows Gleannloch Farms is a twenty-one acre master-planned development in northwest Harris County north of Beltway 8 and west of Interstate 45 ("I-45"). The primary component of the development is more than 2,300 single-family residences with amenities such as a 27-hole golf course, lakes, parks, hike and bike trails, equestrian center, recreation centers, playground, swimming pool and tennis courts. Gleannloch Farms has two commercial reserves, one on the south

end and one on the north end. The southern end of Gleannloch Farms is bordered by Spring Cypress Road.

The subject property is part of the northern commercial reserve. The commercial reserve is restricted for commercial development and architectural controls have been placed upon it. The subject property fronts Boudreaux to the south. On its western side is Champion Forest, which passes through Gleannloch Farms. On its eastern side, Crescent Clover was supposed to intersect Boudreaux and provide a second point of access through Gleannloch Farms but it was stopped short. The City of Houston has designated both Boudreaux and Champion Forest, as well as Spring Cypress, as major thoroughfares. An access way, about eighty-five feet wide, connects the western part of the subject property to the eastern part so that both commercial portions of the subject property are connected and have cross-access.

Three expert witnesses testified to their opinions of the subject property's market value as of the date of taking, September 3, 2014. One of Gleannloch's experts, Matthew Deal, was the first to testify. Gleannloch then called the State's expert, Michael Urban. He was followed by Gleannloch's second expert, David Bolton. Ron Dagley, president of Raymond R. Betz Interest, Inc. and Betz Commercial Brokerage, Inc., then testified on behalf of Gleannloch. Finally, Urban was called to the stand by the State.

1.      *Matthew Deal*

Deal estimated the subject property's value to be $9,247,704. For 14.42 acres, the price per square foot ("psf") thus averaged to $14.72.

The subject property is a commercial reserve which Deal described as the area set aside, typically on main roads, for commercial development such as restaurants,

gas stations, grocery stores, retail stores, banks, etc. It is restricted for commercial development to enhance the value of Gleannloch Farms and architectural controls are in place to ensure it is put to a proper use in conformance with the high standards of Gleannloch Farms. Deal testified the commercial reserves are the most valuable portions of the property, they are on the major thoroughfares and supported by all of the residential housing. The development on the southern commercial reserve provides evidence of what was intended for the northern portion. Because of the taking, Gleannloch Farms cannot develop the northern end of its commercial reserve.

Deal testified the subject property was really "improved property" and not "vacant land." Gleannloch Farms is not in the City of Houston so the water and sewer utilities are provided by a municipal utility district. The subject property has direct access to those utilities and the pipes were already there for development. The property had off-site detention so there was no land loss, typically ten to twenty percent, for detention use. Deal took these factors into account in appraising the subject property.

Deal testified the demographics for the subject property were "incredible" and "good in every regard." According to Deal, residences drive the commercial development and in a five mile radius of the subject property there were 169,000 residents. The average value of a home in Gleannloch Farms was $500,000 with some worth $2.4 million. Within a three-mile radius of the subject property the average household income was $123,000 a year, which is roughly five times the average household income in Houston of about $25,000 a year. For commercial development, that average income is very important. In the area of the subject property, the population and the average household income was increasing.

According to Deal, the amount of traffic is very important to the value of commercial property. C. J. Hensch and Associated conducted a study of how much traffic there was on Boudreaux in front of the subject property. The study reflected 15,800 plus vehicles per day ("vpd"). Deal testified that was "a lot" of traffic.

There were plans from the Texas Department of Transportation ("TxDot") showing Champion Forest extending north of Boudreaux and the widening of Boudreaux from two to four lanes. At the location of the subject property, Boudreaux is a two-lane asphalt paved road and the Grand Parkway is on top of it. Deal testified widening Boudreaux at that point would have wasted millions of dollars because the Grand Parkway was "going to wipe it out."

Boudreaux becomes Spring Stuebner, which is four lanes. Before Spring Stuebner was widened to four lanes, a traffic study counted 16,701 vpd. On Spring Stuebner between Mossy Oaks and Kuykendahl, the traffic count was 6,233 vpd and it was widened to a four-lane standard roadway as part of the construction project. To the west of the subject property, Boudreaux had already been widened to four-lanes. Spring Cypress, to the south of Gleannloch Farms, was four lanes. Kuykendahl, to the east, had recently been widened to four lanes; the traffic count was 12,737 vpd. Gosling, a two-lane asphalt-paved road like Boudreaux, was being widened to four lanes and its traffic count ranged from 6,700 to 12,530 vpd. On the day of the taking, the traffic count on Boudreaux was roughly 16,000 vpd.

Deal "appraised the property as if it's on a two-lane road, but based on this information, as well as the fact that Boudreaux has been widen [sic] in other parts that aren't where the Grand Parkway is not overlaying Boudreaux, it's reasonably probable and clear in my mind that Boudreaux would have been widen [sic], but for the Grand Parkway. If it wasn't for the pending construction and ultimate taking of

7

Boudreaux for the Grand Parkway, Boudreaux would have been widen [sic] to a four-lane roadway."

Deal testified that he spoke to two property owners who had attempted to develop their property which was east of the subject property. The City of Houston would not let them develop their property because it was in the path of the Grand Parkway. According to Deal, those properties would otherwise have been developed. Deal also testified the land north of the subject property was owned by Mr. Pancasarp, who already has an engineer's plans for development of that property. Deal testified the market area in the immediate vicinity of the subject property has been in limbo since 2010 and Boudreaux was not widened by Harris County because of the Grand Parkway project.

Deal testified the highest and best use of the subject property is mixed-use commercial development — small pad sites that are independent economic units for uses such as a bank, pharmacy, retail shopping — that all have cross-access to each other and access to a major road, such as Champion Forest. Deal consulted with Peter Bosher of RVI Planning as to how the market would develop the subject property. Bosher gave Deal multiple plans with different options for "pad-site" development wherein pads would be sold to individual users. The pads would have access to each other and to Champion Forest and Crescent Clover.

There are ten residential subdivisions, including Gleannloch Farms, on Boudreaux. Deal testified the people living in those subdivisions create a demand for groceries, gas, fast food, car washes, and pharmacies. That demand, where there is no current commercial development, is what makes the subject property so desirable. Deal testified that but for the taking of the north end along Boudreaux there would have been commercial development, as there was in the commercial

reserves that the southern end of Gleannloch Farms and the southern entrance of Champion Forest.

When Gleannloch Farms was created, the commercial reserve was designed for a larger user such as an H-E-B grocery store. Deal testified a grocery store creates a lot of traffic and other types of users, such as gas stations, shopping centers with nail salons and dry cleaners, fast food restaurants and banks, quickly follow. In October 2013, H-E-B acquired the tract immediately across Champion Forest from the subject property. Part of H-E-B's property was also taken by the Grand Parkway project. Deal opined that H-E-B chose that location because of "the rooftops . . . the supply of people and the dollars that are there, the income levels that are there." Deal stated that H-E-B "would have known, but for the taking, that Boudreaux would have been widen [sic]" and H-E-B was there because of the population and income. H-E-B was planning to start construction in February 2016 and open in October 2016. Deal testified the fact that H-E-B was coming into Gleannloch Farms was evidence it is an excellent location.

Deal was questioned about an H-E-B built at Rayford Road and Riley Fuzzel where the Grand Parkway went through at the front of the property. Shortly after H-E-B's entry, from July 2014 to January 2015, four tracts of land across Rayford quickly sold for at values from $15.25 psf to $19 psf. The land was being used for a Texas Children's Hospital site, Sonic, car wash, and a retail shopping center. Those properties share access, as the subject property could since it is has a single owner.

Deal also considered an H-E-B built at League City Parkway and South Shore Boulevard for highest and best use as well as "absorption," which is how quickly neighboring properties are purchased. From May 2014 to June 2015, four tracts of nearby commercial property, ranging in size from 1.3 acres to 2.7 acres, sold for between $16.40 psf to $19.00 psf. The properties all had cross-access, like the

subject property, which Deal stated was important. The one farthest away actually sold for the most. The uses were a car wash, fast food, and a shopping center. According to deal, those properties sold once H-E-B announced it was opening a store.

Deal testified he did not use the sales prices of the properties near those two H-E-B's, even though it was a similar market, because there were other transactions in closer proximity to the subject property that were more appropriate. Deal looked at eight transactions in the same market area, with similar density of development, income level, and highest and best use. Another factor he considered was when the transaction occurred versus the date of value. Because the western portion of the subject property was closer to the major thoroughfare, it was worth more than the eastern portion. Deal determined the value of the western portion to be $16 psf and the value of the eastern portion to be $13 psf.

Deal's comparable sale No. 1 was at the corner of Spring Cypress, a four-lane major thoroughfare, and Grant Road, a two-lane major thoroughfare that was asphalt paved with open ditch drainage, similar to Boudreaux. It sold in February of 2015 for $21 psf and the demographics of that property were very similar to the subject property. The population was 180,000 as compared to the subject property being 170,000. The income per household was $121,000 as compared to the subject property being $118,000. There was an H-E-B right across the street, facing Grant Road. Traffic on Spring Cypress was 10,530 vpd and 5,500 vpd on Grant Road. The traffic on Boudreaux was superior, at 16,000 vpd.

Comparable sale No. 2 was a 2-acre tract that sold in July 2014 for use as a car wash at $14.27 psf. It had frontage on Spring Cypress but lacked reciprocal access to the other properties; thus it was not as valuable as the subject property.

10

However, No. 2's location on the south side of Gleannloch Farms, where there had been more development, was superior to that of the subject property.

Comparable sale No. 3 was a 1.6-acre tract on the west side of Gosling, a two-lane road with traffic of approximately 12,500 vpd. It sold in June of 2014 for $12.25 psf for use as a small, single-use commercial building. The No. 3 property was not in the Woodlands, there was a mobile home across the street with a taxidermist next door, older residential homes, and a couple of boxcars nearby. Deal testified it was not as valuable overall because the subject property is at the entrance of Gleannloch Farms and has all of those rooftops behind it. Both the western and eastern portions of the subject property were superior. To be commensurate with the features of the subject property, the sale needed to be adjusted upwards.

Comparable sale No. 4 occurred in January of 2014 for $17.00 psf. It is located near Kuykendahl and FM 2920, both major thoroughfares and was developed for a Dairy Queen fast food restaurant. A Kroger grocery store is located just south of the property, a Walmart is across the street, and there are a number of retail establishments in the area. The traffic on Kuykendahl is about 19,000 vpd. Overall, it has similar demographics to the subject property but more commercial development nearby as well as higher traffic. However, the western portion of the subject property is at the intersection of two major thoroughfares and both portions have easy access to a major thoroughfare. The No. 4 property is only on Kuykendahl. The subject property is part of a master-planned high-end community; the No. 4 property is not. Overall, Deal adjusted the No. 4 sale down, to $16 and $13 psf, respectively, for the western and eastern portions.

Comparable sale No. 5 was also in January of 2014 and is very close to Gleannloch Farms with similar demographics. It sold for use as a 24-hour emergency care and is on 1.6 acres. The traffic is similar to the No. 2 property. It is part of a

11

larger development with cross-access to a CVS pharmacy, bank, and Taco Bell, and is across from a Kroger. It has access to Champion Forest and Spring Cypress. The No. 5 property sold for $19.20 psf whereas the No. 2, without cross-access, sold for $14.70 psf. Deal testified this is a great comparison of the importance of shared access.

Comparable sale No. 6 is in the Kuykendahl/FM 2920 area. It is part of the same development as the No. 4 sale. It is a one-acre tract that sold in February of 2013, almost a year before the No. 5 property, at $20 psf. It was developed as a Shell Credit Union. Deal testified it is a superior sale overall because of higher traffic and two four-lane roads. A mitigating factor on its superiority is that it is not part of a property like Gleannloch Farms. Deal testified the market had been increasing from the time of that sale and would have sold for more by September 2014. Because the No. 6 property was better than the subject property overall, the price was adjusted downward.

Comparable sale No. 7 was located on the south side of West Rayford, just east of Kuykendahl. It was 6.4 acres and has access to Kuykendahl but that access is not as good as the access at the subject property. The sale for $13 psf occurred after construction of a Kroger was announced across the street. Deal testified there was no activity on the back of the property and it would be a lower value than the front, which "is going to be a lot more than $13." The subject property, on the other hand, is all frontage. The No. 7 property fronts West Rayford, with a traffic count of only 4,000 vehicles per day and it is inferior to the subject property.

Comparable sale No. 8 was for $25 psf. It was bought for development of a Taco Bell and a bank, which are similar to the types of use anticipated for the subject property. It is in the parking lot of a Kroger and demonstrates the demand created by a grocery store. Initially, Kroger paid $8 psf for 20 acres; the No. 8 property is

12

the front of that property which two years later sold for $25 psf. This shows that Kroger, like H-E-B, creates significant demand for transactions at a higher level, just like the subject property. A comparison between sale No. 3 and No. 8 reflects the difference between the two is their location. The No. 8 property, in the parking lot of a Kroger, sold for twice the amount as the No. 3 where there is not a lot of development. According to Deal, this is a clear indication that the proximity to a Kroger-type store maximizes value. The traffic count for the No. 8 property was about 13,500 vpd while it was around 16,000 in front of the subject property. The demographics of the No. 8 property are not as good as those of the subject property but because it is in the parking lot of a grocery store it is superior overall.

To summarize, Deal considered eight comparable sales from February 13, 2013, through February 26, 2015. The properties ranged in size from 0.975 acres to 6.397 acres and sold for between $12.25 psf and $25 psf. The properties near an H-E-B or similar retail establishment were No.1 ($21 psf), No. 7 ($13 psf), and No. 8 ($25 psf). Comparable sale No. 7 had a traffic count that was seventy-five percent less than that of the subject property. The sales at the southern end of Gleannloch Farms were No. 2 ($14.27 psf) and No. 5 ($19.20 psf). Comparable sale No. 5 had cross-access while No. 2 did not.

Deal estimated the market value of the western portion, 359,706 square feet, to be $16 psf for a total of $5,755,296. The eastern portion was valued at $13 psf for a total of $ 3,489,408. The grand total was $9,244,704.

2.    *David Bolton*

Bolton testified Boudreaux would have been widened based on the following facts. Boudreaux was on the major thoroughfare plan for the City of Houston which meant it would be widened when the traffic warranted it. The traffic count was 16,000 vpd so it was heavily traveled and other roads with similar traffic had already

been widened. Boudreaux has more traffic than six of the other eight roads that were already expanded from two to four lanes. The typical traffic count at which the county widens a major thoroughfare is 12,000 to 13,000 vpd. The population was approximately 60,000 within three-miles of the subject property and it was projected to increase about two and a half percent per year within that three-mile area so that in five years there would be an additional 10,000 people. H-E-B had purchased property as part of the development and as a big traffic generator it would bring other retailers. Also, the fact that both ends of Boudreaux had already been widened to four lanes reflected that it would also have been widened in front of the subject property.

Bolton testified Boudreaux would have been widened had it not been for the taking, based on the traffic count, demographics, trend of the demographics, and developments, such as the H-E-B, that were known to be about to begin. Bolton testified he appraised the property based upon what the circumstances would have been with this property had there been no Grand Parkway project. He evaluated the subject property based upon Boudreaux being a four-lane road.

Bolton testified that in accordance with the project influence rule the detrimental effects of the project are disregarded. Stated another way, the depressed value of the property due to the State project is not considered. Bolton testified that he found the coming Grand Parkway depressed the values of the subject property and property around it but he appraised the property as if there were no depressive effect. He looked at what the circumstances of Boudreaux would have been had it not been for the project. Bolton testified he disregarded the negative impact of the project and appraised the property as if there were never a project.

14

The intersection of Boudreaux with Champion Forest, another major thoroughfare, was a very good attribute for a commercial property. Bolton testified that but for the taking Crescent Clover would have been completed.

Bolton testified there are no comparable sales around the subject property because it is being overlaid with the Grand Parkway. The comparable sales he used are around development or being developed.

On the date of taking, on Boudreaux from Telge to SH 249, there were 6,529 homes built or in the process of being built. These rooftops have brought a Sam's Club, 600,000 square feet of retail, 15 pad sites, and retail along Boudreaux. The traffic count on SH 249 is 24,000; it was 15,804 on the subject property as of the date of taking.

A 140-acre tract owned by the Finger family was slated for development including commercial sites and multi-family and single-family residences. Boudreaux, once realigned, goes through the middle of the Finger property taking 50 acres so development was put on hold. Had there not been a Grand Parkway project, there would have been a very large development underway in that area. Bolton attributed the lack of commercial or retail development between SH 249 and the subject property as of September 3, 2014, to the Grand Parkway project. "There would have been commercial development all along Boudreaux Road had it not been for the taking."

The average age of the population within three-miles of the subject property is thirty-three. Thus there would be a large number of school-age children and a need for fast-food places, grocery stores, banks, and pharmacies. Fifty percent of the households in that three-mile area have a household income over $100,000 so they have purchasing power.

15

Bolton testified the subject property's proximity to a proposed H-E-B would attract retail development similar to his nine comparable sales. According to Bolton, a user like H-E-B gives value to smaller commercial sites. The smaller retail activity is quick to follow once such a user has a site under contract.

Bolton had nine comparable sales. Bolton testified that "comparable" sales need to be comparable to the types of uses allowed on the property. The subject property could not be used for a car dealership or a senior living facility. The subject property has commercial water in quantities that could service commercial development, with available sewer connections and storm sewer connections. The subject property has a regional detention area so none of the property has to be used for on-site detention.

In choosing those sales, Bolton selected properties with similar characteristics such as highest and best use, improvements that were built or planned to be built, physical features such as utilities, detention, and storm sewage, the roadway, the costs and number of homes, the architectural and use restrictions, and landscaping requirements.

Comparable sale No. 1 was 5.34 acres and sold for $20 psf on February 26, 2015. It was divided into three pad sites and a strip center site and was to be used similar to what could be done on the subject property. It is part of the commercial reserve of the Indian Trails residential development, which is similar to and near the same caliber as Gleannloch Farms. An H-E-B is across the road and the traffic counts and demographics are similar to the subject property. Sale No. 1 was on a two-lane asphalt road, similar to Boudreaux. It had all utilities. Bolton testified the deed would reflect any encumbrances or restrictions, like a pipeline or power line running through the property. The population was a little higher, with a slightly lower median income, and slightly higher home prices. The location was a little better than the

subject property. Bolton valued the subject property at $15 psf, based on it being used for multiple economic units approximately one to three acres in size.

Comparable sale No. 2 was 1.623 acres and was not part of a master-planned development. It was on a two-lane asphalt paved road, Gosling, one mile from an entrance to The Woodlands. It was an inferior tract and fairly isolated. There was no commercial development in the immediate area. The traffic count on Gosling, also designated as a major thoroughfare, was 12,530 vpd and it was being widened to four lanes. It sold for $12.25 psf in June 2014. Because it does not have Gleannloch Farms behind it, a Champion Forest or Crescent Clover, sale No. 2 is inferior to the subject property. It is in a growth area but has a lower traffic count. It has a population of 53,000 within a three-mile radius. The average household income is lower and the median home price is about the same.

Comparable sale No. 3 was 3.1171 acres, was for $22.83 psf on May 16, 2014. It is south of where Boudreaux cross Highway 249 and is a Rudy's Restaurant and Country Store. A restaurant of that size could go on the subject property. Sale No. 3 has a superior road frontage but about the same population. The average household income is lower than the subject property but the home values are about the same. Bolton described this sale as the "upper limit of value" which should be adjusted down because of location but the other factors "are pretty even." The frontage road is one-way and the subject property would have more convenient access from three streets. Thus the immediate access to the subject property was superior but sale No. 3 property had superior regional access. Sale No. 3 is not on a corner. It did have all utilities and off-site detention.

Comparable sale No. 4 is an approximately one-acre tract used for a Dairy Queen. It sold in January 2014 for $17 psf. It is on Kuykendahl, a four-lane road, and part of Klein Crossing retail development. The traffic count is 16,556 vpd. It is

17

in a commercial development with apartments behind it. The population is slightly less, 57,000 in a three-mile radius, and the average household income is about ten to fifteen percent less. The median price of a home is about the same. The subject property is superior but sale No. 4 had more development around it.

Comparable sale No. 5 was for $20 psf of 1.129 acres in February 2013. Market prices were increasing from that date until the date of taking. Population was about the same, the average household income was ten to fifteen percent less, and the median price of a home was about the same. Sale No. 5 property was on FM 2920, a four-lane road with a traffic count of 25,600 vpd. It is in the Klein Crossing subdivision where there is more development, including a Kroger, than the subject property. The property was used for a bank and is a mid-block parcel with reciprocal access. Bolton testified the shared access has a positive effect on the property's value.

Comparable sale No. 6 was 1.79 acres on Holzwarth Road, south of Spring Stuebner, and about three-fourths of a mile west of I-45. It sold June 29, 2015, for $20 psf. Holzwarth was not constructed at the time of the sale. Sale No. 6 is part of a subdivision; there was no other commercial development around sale No. 6 at the time. It had utilities and detention. It is a triangular-shaped tract and inferior to the subject property. It is used for a temperature-controlled storage facility.

Comparable sale No. 7 sold for $13 psf in October 2014. Because of the depth of that tract, it was 6.397 acres, the front is being developed for a retail strip shopping center while the back is vacant. The buyer hopes to use it for a motel or hotel; a type of use that would sell for less than retail commercial property like the subject property.

Comparable sale No. 8 is across the street from sale No. 9 and was 1.369 acres. Sale No. 8 occurred in June 2014 for $25 psf. Comparable sale No. 9, for 1.815

acres, was in 2013 for a Kroger at $20 psf. Bolton indicated the rise in price was partially due to the rising market from 2013 to 2014. At the time of sale No. 9, Kroger was not open and the entire shopping center was under construction. There were impediments to No. 9 such as it had to have on-site detention and the storm sewer had to be taken about 200 feet down from the front of the property, where underground gas and cable lines were encountered. There was a power line through the middle of the property requiring a set back of the buildings and the loss of some usable land. The property is used for a Starbucks, a dentist, Jet Pizza, and a Smoothie King. These are the types of use Bolton would expect to be the highest and best use of the subject property. He testified that any one or all of those could be on the subject property. Sale No. 8 did not have any of the impediments of sale No. 9 and the Kroger had already opened. It sold for $5 more psf. The No. 8 property is to be used for a Taco Bell and a Bank of America. Those are the types of uses that would be highest and best for the subject property. Bolton considered the H-E-B site was there, but not constructed, in comparing sale No. 8 and sale No. 9 to the subject property. The property that sold for $25 psf is part of a larger development. The frontage property along the road is the prime retail portion of a larger tract.

Bolton testified sale No. 7, No. 8, and No. 9 were inferior in terms of the general market; they have less population and the demographics are not as good. However, the four-land roadways were already there. The traffic count on Kuykendahl was 13,000 vpd while the traffic count on West Rayford was about 4,000 vpd. Both were designated major thoroughfares.

Bolton's comparable sales ranged from $12.25 psf to $25.00 psf and occurred from February 2013 to June 2015. Bolton valued the subject property at $9,421,830, which averages to $15 psf.

3. *Ron Dagley*

19

Dagley was the general manager of the property and involved in the daily operations including the architectural control committee and marketing the individual sites within Gleannloch Farms. Gleannloch anticipated retail development along Boudreaux similar to that on the south side along Spring Cypress. Dagley testified the subject property is definitely a retail site with frontage on Boudreaux, Champion Forest, and Crescent Clover. Crescent Clover was not completed up to Boudreaux as of September 3, 2014, because of the taking.

The fact the subject property is located at the intersection of two major thoroughfares is significant to its value as it provides easy access to the location from the residents in the area. The crossover easements through the back portion and the connection to Champion Forest, as well as Crescent Clover, with exposure to a major thoroughfare like Boudreaux, made the subject property ideal for retail development. Because of the crossover easements, the interior of the subject property was not worth less than the corners. Also, because of the shared access, the property further away from the H-E-B was not less valuable. According to Dagley, the highest and best use of the subject property would have been to subdivide it into one, two or three-acre tracts and sell it for pad sites.

The H-E-B is a real attraction to that type of site and, according to Dagley, if there had not been a taking that would have occurred. Dagley testified the H-E-B purchase created a lot of interest in pad sites but he informed interested buyers it was not available because a tollway was going over the top of it. Property on South Shore Harbor in League City that Dagley developed sold for pad sites "virtually within six months" of H-E-B committing to building a store. Dagley testified "when H-E-B buys a property, they're pretty consistent. They're looking for certain demographics in a certain area. They have to have a certain number of rooftops. Certain number of people. Income levels. Those are all things that they take into account. So when H-

20

E-B does their due diligence and buys a property in a particular area, like the South Shore tract, then other retailers know that that due diligence is pretty positive toward other retail uses."

Dagley testified that in September 2014, the market was very strong and H-E-B was committed to the site next to the subject property so "it was an ideal time." The rooftops in the subdivisions created demand for retail and an opportunity for retail/commercial development. There was no doubt in Dagley's mind that absent the taking, there were have been demand for multiple retail users on that property. Because of the shared access, the property further away from the H-E-B was not less valuable.

The subject property was taken off the market because Dagley had a fiduciary duty to disclose the tollway's location. Given the Grand Parkway's alignment to Boudreaux, Dagley was not surprised Harris County had not widened it.

The subject property was deed-restricted and Dagley stated permitted uses were fast-food or sit-down restaurants, banks, service stations, or retail. According to Dagley, a car dealership or an assisted-living facility were not legally permitted uses of the subject property.

4.    *Michael Urban*

Urban first took the stand after Deal testified. Urban did not determine the population or income level, nor the projected growth, within a one, three or five-mile radius of the subject property. Development increased in the area in late 2012 to 2013 as the financial crunch was turning around and the market was improving. Urban recalled there were 6,000 people living in Gleannloch Farms but he did not know the number of homes being developed in the area as of September 2014.

21

Urban knew part of Boudreaux was four lanes and was not aware of any plans to widen Boudreaux in front of the subject property. Urban recalled speaking with Tina Williams, Director of the Right of Way Division for Harris County, about whether Boudreaux would be widened and she said, "No." Urban stated that Roland O'Connor, a land planner hired by the State, had told him that but for the Grand Parkway project Boudreaux would have been expanded from two lanes to four lanes in front of Gleannloch Farms. Urban said he did not agree with O'Connor's statement. Urban did not take into consideration that absent the project, Boudreaux would have become a four-lane roadway. The traffic count on Boudreaux that Urban used was 9,403 vpd and that data was from 2005. Urban was unaware the traffic count had risen to 15,800 by August 2014.

The map published in July 2012 showed all of the property along Boudreaux was to be taken for the Grand Parkway project. Urban testified he did not take into consideration whether the development along Boudreaux was affected by the project. He did factor the lack of development along Boudreaux into his analysis. Urban testified that he used comparable sales that were not on the project and therefore they did not reflect a plus or minus due to the project. Urban stated that he did not consider project influence in appraising the subject property because he only considered comparable sales not on the project.

Urban divided the subject property into four economic units. Going from west, across from the planned H-E-B, to east, he valued unit 1 at $15 psf, units 2 and 3 at $8.25 psf, and unit 4 at $14 psf. Urban considered seven comparable sales ranging from $6.50 psf to $14.27 psf. The sales occurred from February 15, 2013, until July 28, 2014.

One of Urban's comparable sales sold for $14.27 psf to be used as an iShine car wash. It was not part of a larger economic unit with multiple pad sites and cross-access among the various sites.

Urban was unaware of Deal's comparable sale No. 5 for $19.20 psf. He testified that after adjustments for location and time, like those he made for the iShine Car Wash comparable sale, the value of Deal's No. 5 property would be $19.52 psf.

Urban testified the wrong location was given for his comparable sale No. 3 and he was incorrect about the proposed usage. The property in Urban's sale No. 3 had a power line across the middle of it.[2] Urban testified he did not take into consideration whether the power line impeded the owner's ability to develop the property. Urban did not account for the fact that the property did not have storm sewage lines or the land area loss for use as a detention pond. Urban agreed that he had been told the buyer effectively paid $20 psf, not $10 psf, for the property. Urban was unaware that property across the street sold for $25 psf. Urban agreed the subject property was in a better location than his sale No. 3 and the subject property could be credited 10 percent over the purchase price.

Urban testified the $14.00 psf price of his sale No. 4, after adjusted to compare to the subject property was $15.43 psf. He stated that he later corrected that price to $17.86 psf. He did not, however, adjust his valuation of the subject property because it was "in the range that [he] felt was reasonable to assume what the property would sell for."

---

[2] This is the same property as Bolton's comparable sale No. 9.

23

Urban's comparable sale No. 5 required detention and utilities. The subject property does not.

After Bolton testified, Urban returned to the stand to testify for the State. Urban divided the subject property into four economic units. Unit 1 is at the corner of Champion Forest and Boudreaux and is 1.9617 acres. Next is unit 2 at 6.2961 acres, followed by unit 3 at 4.2106 acres and unit 4 at 1.9513 acres.

Urban's first four comparable sales were as to units 1 and 4, the corner units. Comparable sale No. 1 was 2.091 acres that sold for $14.27 psf on July 28, 2014. It was at the northwest corner of Spring Cypress and Eastloch Drive, close to the subject property. Comparable sale No. 2, at the southwest corner of Kuykendahl and Spring Garden Lane, was 0.9316 acres, and sold for $11 psf on June 5, 2014. Comparable sale No. 3, which Urban had located at the incorrect location but subsequently corrected (as discussed in his previous testimony), was 1.815 acres that sold for $10 psf on September 4, 2013. Comparable sale No. 4, at the intersection of old 249 and new 249, was on April 30, 2013, for $14 psf. Urban looked at these four sales and made adjustments for superior or inferior characteristics as they compared to economic units 1 and 4 of the subject property.

The adjustments were based on time (from when the sale occurred to the date of taking), location, and size. As compared to unit 1, Urban adjusted the price for sale No. 1 to $13.69 psf sale; No. 2 to $10.76 psf; sale No. 3 to $13.44 psf; and sale No. 4 to $15.43 psf. Based on those adjusted sales, Urban valued unit 1 at $15 psf.

Regarding unit 4, Urban made similar adjustments to the four comparable sales. He considered unit 4 inferior to unit 1 because Crescent Clover was proposed and did not have a "hard corner" or lighted intersection. He assigned a value of $14 psf to unit 4.

Urban applied comparable sales numbered 5, 6 and 7 to unit 2, an interior unit. Sale No. 5 was 4.741 acres located on the north line of FM-2920 that sold for $6.50 psf on June 23, 2014. Comparable sale No. 6 was on SH-249 south of Boudreaux fairly close to the subject property. It was 4.275 acres and sold for $8 psf on August 7, 2013. Comparable sale No. 7 was 4.512 acres along the northerly line of Louetta Road east of Cutten Road. It sold for $7.61 psf on February 15, 2013. Economic unit 2 of the subject property is about 6.296 acres. Urban adjusted sale No. 5 for time, the fact it did not have detention or utilities available, and it was a superior location for a net increase to a value of $8.29 psf. After adjusting for time and a superior location, sale No. 6 was valued at $7.68 psf and No. 7 at $7.00 psf. In light of those adjustments to the three comparable sales, Urban valued both economic unit 2 and 3 at $8.25.

In summary, Urban valued economic unit 1 at $1,281,750; unit 2 at $2,262,612; unit 3 at $1,513,182; and unit 4 at $1,190,000 for a total value for the subject property of $6,247,544.

On cross-examination, Urban was asked about Deals' comparable sale, in the same location as Urban's comparable sale no. 1 (the iShine Car Wash), for $19.20 psf. He agreed that making the same adjustments to Deal's sale as he made for his own would result in a value of $19.52. Urban admitted he did not find that sale.

Regarding Urban's comparable sale No. 2, fronting Kuykendahl, Urban agreed the primary access to that property was Springbrook Gardens, which is not a major thoroughfare but dead-ends into a subdivision. It was purchased for use as a dentist's office. Since the date of purchase, there had been no activity on that tract of land of which Urban was aware.

Urban's comparable sale No. 3was for the tract initially identified in the wrong location. Urban thought it was going to be used for an NTB (National Tire &

Battery). As of the date of his May 7, 2015, report, there was a shopping center and a Starbucks on that property. Urban was aware the buyer had stated the "effective" price of the property was $20 psf. It was Urban's opinion the subject property was in a ten percent better location than his sale No. 3. Making that adjustment would place the value of that property at $22 psf. The time adjustment would be an additional twelve percent in favor the subject property, raising the value to $24.64 psf. Urban agreed that he had heard that directly across the street from this particular property there was a sale for $25 psf. Urban did not confirm that sale and did not use it because he did not have that information.

Urban's comparable sale No. 4, after adjustments, was $17.86 psf. Thus the range of three of Urban's sales was $17.86 to $24.64, excepting the one that was purchased for a dentist's office on a road that dead-ended into a subdivision.

Urban was unaware of the use to which his comparable sale No. 5 was to be put. Urban agreed that property needed utilities extended to it from offsite in order for it to be used for anything. Urban did not determine the cost of that. The property also needed detention and Urban made a 15 percent adjustment for that although he did not determine how much land would be needed for detention or what it would cost.

Comparable sale No. 6 was purchased by Beck & Marsten, a car dealership. Urban agreed that an automobile dealership is not an approved use for the subject property.

Urban's seventh comparable sale was used for a retirement or rest home facility. Urban "never saw where" the subject property could not be put to that use. He believed it was a commercial type of improvement and "never saw anywhere any kind of restriction that said you couldn't put this type of improvement on there." He believed sale no. 7 could be used.

26

Urban admitted that he had no comparable sales indicating the mid-block parcels, his economic units 2 and 3, should be valued at 45 percent less than the corner parcels, economic units 1 and 4.

## C.  Analysis

Market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) (quoting *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 979, 979, modifying 126 Tex. 604, 89 S.W.2d 194, 202 (1936)). Traditionally, there are three approaches to determining market value: the comparable sales method, the cost method, and the income method. *Id.* (citing *Religious of the Sacred Heart v. City of Houston*, 836 S.W.2d 606, 615–17 & n. 14 (Tex. 1992)). The comparable sales approach is long-favored. *Id.* "If the goal of an appraisal is to ascertain market value, then logically there can be no better guide than the prices that willing buyers and sellers actually negotiate in the relevant market." *Id.* The comparable sales approach requires the appraiser to find data for sales of similar property and then make adjustments, upward or downward, based on differences in the subject property. *Id.* These comparable sales must be voluntary and should take place near in time to the taking, occur in the vicinity of the property taken, and involve property with similar characteristics. *Id.* As long as they meet the test of similarity, it is not required that the comparable sales be in the immediate vicinity of the subject property. *Id.*

In the case at bar, all three experts used the comparable sales approach. Further, they all agreed the highest and best use of the subject property was commercial development. The State does not dispute the propriety of using the comparable sales approach; whether commercial development was the subject

property's highest and best use; or the similarity of the subject property to the comparable sales used by the experts. Rather, the State contends that the experts' opinions establish absolute limits for the range of values available for consideration by the jury. Because no witness testified to a fair market value outside that range, the State contends, the evidence is legally and factually insufficient to support the verdict.

We disagree that this is a correct statement of the current law. This court has previously rejected the State's position, albeit when the jury's finding fell below the range of the expert opinions. *See Waterways on Intercoastal, Ltd. v. State*, 283 S.W.3d 36, 43 (Tex. App.—Houston [14th Dist.] 2009, no pet.). As we stated in *Waterways,* "As long as 'a rational basis for the calculation of damages exists, a jury's finding will not be disregarded merely because its reasoning in arriving at its figure may be unclear.'" *Id.* (quoting *Pleasant v. Bradford*, 260 S.W.3d 546, 559 (Tex. App.—Austin 2008, pet. denied)). *Callejo* does not dictate a different result in this case because in that case there was "no testimony *or other evidence in this record* that the post-taking value was higher than [the amount awarded]." *Callejo* 755 S.W.2d at 76 (emphasis added). As noted above, only if the jury's verdict lies outside the range of testimony will we find the evidence fails to support the verdict. *Id*. And as the *Callejo* court recognized, had the case been submitted by a broad-form question on value, rather than separate questions on pre- and post-taking values, there would likely have been nothing to review. *Id.* In this case, submission was by broad-form.

Likewise, the more recent decision of *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820 (Tex. 2014), is distinguishable from the case at bar. In that case, the two sites used for "stigma" damages were not sufficiently similar to be comparable to the subject property and the record did not

demonstrate the dissimilarities were accounted for through valid adjustments. *Id.* at 835–36. Similarly, in *Wood v. Kennedy*, 473 S.W.3d 329 (Tex. App.—Houston [14th Dist.] 2014, no pet.), we concluded the landowner valuation testimony of fair rental value was insufficient because the testimony did not indicate the factual basis for concluding the other property was similar and that a particular adjustment was appropriate given the differences. The similarities of the comparable sales used by the experts in this case were presented through testimony and other evidence and the experts explained how they accounted for the dissimilarities through adjustments. Also, in *Silberstein v. Trustmark Nat'l Bank*, 14-14-00660-CV, 2016 WL 93871, *6 (Tex. App.—Houston [14th Dist.] Jan. 7, 2016, pet. denied), and *Village Place, Ltd. v. VP Shopping, LLC*, 404 S.W.3d 115, 136 (Tex. App.—Houston [1st Dist.] 2013, no pet.), this court and the First Court of Appeals, respectively, concluded the evidence was insufficient where it failed to indicate appropriate adjustments were made.

But the question here is not whether the evidence supports the experts' valuations. Rather, the issue presented is whether the jury is confined to those opinions or is able to consider all of the evidence presented and draw its own conclusions. In other words, can the fact-finder review the evidence of comparable sales and the differences between those properties, make adjustments, and arrive at a different value than the experts? In *Waterways* this court held that so long as there was other evidence to consider, and the jury's finding was within the range of value supported by the evidence, it was within the jury's province to go below the expert's opinion of market value. There is no basis in law for this court to hold the jury cannot also go above.

As the evidence discussed above reflects, the majority of the sales used by Deal and Bolton were very near or above the jury's finding that the subject property

was worth $21 psf. But the jury heard more than the experts' opinion as to the value of the subject property. The experts' reports, maps, photographs, and descriptions of the comparable sales were admitted into evidence. The jury heard evidence that had there been no Grand Parkway project, Boudreaux would have been widened to four lanes. There were ten residential subdivisions on Boudreaux. The jury heard evidence the Grand Parkway project had depressed development in the area of the subject property and was instructed in accordance with the project influence rule to value the property as if there were no such project. The jury heard evidence from which it could have found that absent the Grand Parkway, the northern commercial reserve of Gleannloch Farms would have experienced retail development comparable to that which occurred on the southern end. Evidence presented to the jury demonstrated that properties at the southern end sold for $20 to $25 psf. The jury's finding on the value of the subject property at $21 psf falls within the range of evidence presented to the jury and therefore is supported by sufficient evidence. *See Waterways*, 282 S.W.3d at 45.

As the foregoing demonstrates, the jury's finding is supported by more than a scintilla of evidence. Thus the evidence is legally sufficient to support the judgment. Further, the State has not shown how, considering all the evidence both in favor of and contrary to the finding, the jury's award is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176. Because the jury's award was within the range of evidence presented, the evidence is factually sufficient to support the judgment. *See id*. Issue one is overruled.

#### ADMISSION OF EVIDENCE

During Urban's testimony as an adverse witness, Gleannloch offered into evidence an affidavit by Tina Williams. The State objected on the grounds of hearsay

and failure to disclose in response to requests for discovery. The trial court overruled the State's objections and admitted the affidavit into evidence. In their second issue, the State asserts the trial court erred.

On appeal, the State contends: (1) the affidavit constituted inadmissible hearsay, and (2) was not disclosed in response to discovery requests. Assuming, without deciding, the trial court erred in admitting the affidavit, we conclude any error is not harmful.

To obtain a reversal based upon the improper admission of evidence, the State must show the trial court's error probably caused the rendition of an improper judgment. *First Transit, Inc. v. Alfaro*, 14-14-00063-CV, 2015 WL 1623064, at *6 (Tex. App.—Houston [14th Dist.] Apr. 7, 2015, pet. denied); Tex. R. App. P. 44.1 (a)(1). Error in the admission of evidence generally is not grounds for reversal unless the appellant can demonstrate that the judgment "turns on" the challenged evidence. *Bhatia v. Woodlands N. Hous. Heart Ctr.*, 396 S.W.3d 658, 668 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *accord In re A.D.*, 474 S.W.3d 715, 728 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The State contends the affidavit undermined the credibility of its only valuation witness, Michael Urban. The State argues "[e]valuation of the entire case, including the verdict, undeniably demonstrates the erroneously admitted Affidavit probably resulted in an improper judgment." We disagree.

The jury's verdict was not only higher than Urban's valuation but was also greater than the valuations of Gleannloch's witnesses, Matthew Deal and David Bolton. Regardless of the effect of the affidavit on Urban's credibility, the verdict reflects that the jurors relied upon the range of evidence presented to them in the course of expert testimony.

Moreover, as the evidence set forth above shows, Gleannloch's witnesses contradicted and undermined Urban's valuation testimony. Accordingly, there was a basis, other than Williams' affidavit, for the jury to reject Urban's conclusions as to the value of the subject property. Because the State has not shown the judgment turned on the affidavit, we cannot say its admission, even if error, was harmful. Issue two is overruled.

## THE PROJECT INFLUENCE RULE

Finally, the State argues the trial court erred in improperly applying the project influence rule and admitting evidence of project influence and of damage due to the State's announcement of plans to condemn property in the future. The State's brief references objections, and requests for running objections, as to the announcement of the project that were made: (1) prior to voir dire; (2) before Gleannloch's opening argument; (2) before Matthew Deal testified; (3) before Mike Urban testified; (4) during Mike Urban's testimony; (5) before David Bolton testified; (6) before Ron Dagley testified; (7) and before Gleannloch's closing argument. All of the State's objections were based upon *Westgate, Ltd. v. State*, 843 S.W.2d 448 (Tex. 1992), which held a property owner cannot recover damages caused by the public announcement of future plans to condemn property where the government has not imposed a current, direct restriction on the property's use.

Subsequent to the trial of this case, but before appellant's brief was filed, the Texas Supreme Court decided *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 144 (Tex. 2016). In *Caffe Ribs*, the Court distinguished *Westgate* because Caffe Ribs was seeking to recover the hypothetical price that its property would have brought on the date of the State's *de jure* taking, unaffected by the project. Like *Caffe Ribs,* this case does not involve a claim for a *de facto* taking when the project was announced, but a *de jure* taking identified by the statutory condemnation proceeding. The State

concedes that Gleannloch was entitled to introduce evidence of alleged decrease in property value due to the project, but only from December 31, 2009, to the date of acquisition on September 3, 2014. The State alleges Gleannloch introduced evidence of project influence prior to that date.

We have reviewed all of the State's citations to the record in support of this argument, as described above. The testimony the State refers to does not demonstrate that any evidence of project influence prior to December 31, 2009, was admitted. *See* Tex. R. App. P. 38.1(i); *see also Canton–Carter v. Baylor Coll. of Med.,* 271 S.W.3d 928, 931–32 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (recognizing it is not our duty to review the record, research the law, and then fashion a legal argument for appellants when they have failed to do so). Accordingly, issue three is overruled.

## CONCLUSION

Having overruled all of the State's issues, the judgment of the trial court is affirmed.

/s/     John Donovan
        Justice

Panel consists of Justices Boyce, Donovan and Wise.